## BEEKMAN vs. THE SARATOGA AND SCHENECTADY RAIL ROAD COMPANY.

Acts authorizing rail road companies to take private property for the purposes of the road, upon the payment of a fair compensation, are constitutional.

The mode of ascertaining the damages of the owners of the land taken for the road, by commissioners appointed by the legislature or the governor, is not repugnant to the constitution.

The provision of the state constitution which declares that the right of the trial by jury in all cases in which it has heretofore been used shall remain inviolate forever, relates to the trials of issues of fact in civil and criminal cases in courts of justice.

The *eminent domain* remains in the government, or in the aggregate body of the people in their sovereign capacity, and they can resume the possession of private property, not only where the safety, but also where the interest, or even the convenience of the state is concerned ; as where the land is wanted for a road, canal, or other public improvement.

The only restriction upon the power of the people to resume the possession of property for the purpose of an internal improvement, in which the public, or the inhabitants of any particular section of the state, as citizens merely, have an interest, is that the property cannot be taken for such public use without just compensation to the owner, and in the mode prescribed by law.

It belongs to the legislature to determine whether the benefit to the public from such improvement is of sufficient importance to justify their exercise of the right of *eminent domain,* in thus interfering with the private rights of individuals.

In cases of public improvements, from which a benefit would result to the public, this right of *eminent domain* may be exercised either directly by the agents of the government, or through the medium of corporate bodies, or by means of individual enterprize.

Rail roads are public improvements, from which the public derive a benefit; and the legislature can appropriate the private property of an individual for the purpose of such improvements, or may authorize an individual or a corporation thus to appropriate it, upon paying a just compensation to the owner for the same.

The privilege of making a rail road and taking tolls thereon, when granted to an individual or a company, is a franchise. The public have an interest in the use of the road, and the owners of the franchise are liable to respond in damages, if they refuse to transport an individual or his property upon such road, without any reasonable excuse, upon being paid the usual rate of fare.

The legislature may regulate the use of the franchise and limit the amount of the tolls, unless they have deprived themselves of that power by a legislative contract with the owners of the road.

1831.

Beekman
v.
Saratoga and
Schenectady
Rail. road Co.

The sovereign power has no right to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will not be promoted thereby.

An act of the legislature making such transfer would be a violation of the contract by which the land was granted by the government, and repugnant to the constitution of the United States.

November 26.   THIS was an application on the part of the complainant for an injunction, to restrain the defendants from entering upon or taking possession of that part of the site of their rail road which had been laid out over the complainant's premises.   The bill set out at length the act of the 16th of February, 1831, incorporating the company ; and showed that the stock of the company had been subscribed and the company organized by the election of directors, and the appointment of a president, vicepresident, and other officers and agents, according to the provisions of the act of incorporation.   It also stated that the directors of the company had caused examinations and surveys to be made, and had selected and certified under their hands and seals, the line, course and way of such rail road from Saratoga Springs to the city of Schenectady, and had filed such certificates in the clerks' offices of Saratoga and Schenectady counties.   That the line of the road, as designated and recorded, passed through and upon a lot of the complainant, of which he was seised in fee, and included a strip of his said lot about 80 rods in length, and from 40 to 100 feet in breadth.   That they had also caused the value of the said strip of land to be appraised ; had deposited the amount of the appraisal to his credit, in the Mohawk bank ; and had given him notice thereof.   That all the actings and doings of the company had been done against the will and consent of the complainant.   That the road as laid out through his premises, came near his house and out buildings, where he had established his country residence, and through a grove of pines attached to the same as a part of his pleasure grounds.   That the company had commenced making their road upon the grounds of other persons adjacent to the premises of the complainant, against the consent of the owners of such grounds ; and that he was also informed and believed that they claimed the right, and intended to enter upon that part of the road

which has been laid out through his premises, and to cut through the grove and excavate the grounds, &c. unless restrained by the injunction of this court.

On the part of the defendants, affidavits and other documents were produced, showing that the road had been regularly laid out according to the provisions of the act; that the complainant had refused to treat with them relative to the sale of that part of his premises which was covered by the location of the road, or as to the price; that commissioners had been appointed by the governor to assess the damages; that such damages had been assessed, after due notice to the complainant, and had been deposited in the bank for his use, as required by the act; of which he had due notice. It also appeared by the affidavits produced on the part of the defendants, that the making of the rail road would be a great public benefit; that it could not be laid in any other place without great inconvenience and expense; and that previous to the laying out of the road, the complainant had consented to have it laid out through his lands at the place where it was afterwards laid, or at any other place west of his barn; but that he had retracted that consent after the location of the road had been determined on by the committee of the company.

*A. Van Vechten*, for the complainant. The act, so far as it authorizes the Saratoga and Schenectady Rail Road Company to take private property for the purposes of the road without the consent of the owner, and so far as it prescribes the mode of ascertaining the damages of the owners of the land taken for the road, is unconstitutional, and void. The opinion of citizens as to the public utility of the road is not material to the question of the constitutionality of the act. Is this road such a public improvement as to bring it within the constitutional provision which authorizes private property to be taken for public purposes, upon payment of a just compensation to the owner? I contend that it is not. The defendants are a private corporation, and the road, when made, will be private property; it will not be for public use, but for the private use and emolument of the company, to be used exclusively by its own

carriages. It does not follow, that because this company is authorized to establish a particular mode of communication, that such mode of communication is of course a public improvement, and for the public use. There are many objects beneficial to the public, such as manufacturing companies ; yet no one will contend that the legislature would have power to authorize these companies to take private property for the purposes of the company. A law authorizing private property to be taken for mill sites, as has been done in some of the states, would be unconstitutional, and disregarded by the supreme court of the United States. A good boarding house at the Springs is a great accommodation to visitors and invalids ; but in order to provide such a house, would it be competent for the legislature to authorize a corporation or an individual to take private property ?

We are not to be influenced in the decision of this question by the practice of other states. We have rights under our own constitution. That other states disregard private rights, will not justify our state in doing the same. A mill is very beneficial to the community ; more so than a rail road, as the necessity of eating is greater than that of travelling for pleasure. But it cannot be successfully contended that the legislature could authorize a miller to take private property for the uses of his mill. Upon what ground can this road be said to be for the public use ? Is it a necessary avenue to the Ballston and Saratoga Springs ? Is it to be made from mere motives of benevolence, in aid of invalids who may wish to visit these Springs for their health ? It appears from the act of incorporation, that the road is to be made for private emolument, and for private use ; that the object is to aid the villages of Ballston and Saratoga, and not the public at large. This road is not like a turnpike or a canal. Every man can use a turnpike with his own horses and carriages. He can travel it on foot, and drive his cattle on it, and that for a fixed compensation. So every man who has a boat may use it on a canal. A rail road is used exclusively by the company, with its own carriages, horses and engines, and for its own private profit, and the company is not limited in its charges. The farmers

cannot carry their produce on this road. And the road cannot increase the value of the land through which it passes ; it only benefits the places of termination. The grant of this rail road is a monopoly. The company have the exclusive use of it, for their exclusive benefit. Even if it should benefit the sick, and those who wish to travel rapidly, this circumstance does not constitute such a public use as is intended by the constitution, which cautiously guards against invasions of private property. The constitution does not define what is meant by public use ; common sense must be the expounder. A rail road cannot be deemed a highway, because passengers and goods may be conveyed on it more rapidly than on ordinary roads. The question whether it is a public improvement for the public use, should be determined by the fact who is to use it ? whether the public at large, or the company. There exists also other distinctions between this rail road and turnpikes. If turnpikes are out of repair, the gates may be thrown open by commissioners, and will be kept open until the road is put in repair. Not so with this rail road. In this act of incorporation there is a clause rendering the corporation subject to the general provisions of *R. S. p.* 1, *ch.* 18. The legislature were misled ; they supposed the company was by this clause made subject to the general provisions in the revised statutes relative to turnpikes.

The constitution of the United States, *art.* 1, *sec.* 10, prohibits the enactment of all laws by the states which impair the obligation of contracts. Titles to land acquired by virtue of a grant from the state are contracts. So held in *Van Horne's Lessee* v. *Dorrance,* (2 *Dal. R.* 304 ;) *Terret and others* v. *Taylor and others,* (9 *Cranch's R.* 43 ;) *Dartmouth College* v. *Woodward,* (4 *Wheat.* 518 ;) *Green and others* v. *Biddle,* (8 *Wheat.* 1.) The premises in question belong to the complainant. He could only have acquired the same by a grant from the British crown, confirmed by the state, or by a grant from the state itself. As he holds this property under the sanction and title of the government, he has absolute dominion over it ; and this court will protect him in its enjoyment, except as to so much as may be necessary to be taken for the public use. If the complainant's land was not taken for

public use, the taking was a violation of the constitution of the United States ; as it impaired the obligation of the contract under which the complainant held his title to the land. The taking of the complainant's property violates also the provision of the United States constitution, which declares that no man shall be deprived of his property without due process of law ; that is, process of law as established and acknowledged at the adoption of the constitution. The question arises, what is due process of law ? This act of incorporation requires a negotiation with the owner of the land, before it can be taken. This implies that the land cannot be taken without the owner's consent ; otherwise this negotiation would be a useless proceeding. If no arrangement is made with the owner, commissioners are to be appointed, who determine that the owner of the land shall sell his land to the company, whether he will or not. Whence does the legislature derive the authority to confer such a power upon the company ? Is this due process of law ? By due process of law is meant a judicial proceeding, under the sanction of some court. The proceeding in question is altogether extra-judical. The owner of the land ought also to have some agency in the appointment of the commissioners. His consent to their appointment ought to be obtained. Here the governor, upon the application of the company alone, appoints the commissioners. Another extraordinary feature in this act of incorporation is the allowing the company to deposit the amount of the damages appraised by the commissioners in the Mohawk Bank. What authority had the legislature to constitute the Mohawk Bank the agent to receive the complainant's money ? In laying out highways, the sum awarded for damages must be paid, or tendered to the owner of the land ; and if he refuses to receive it, it must be kept in some safe place. I notice this provision in the act to show the necessity of a constant watchfulness against invasions upon private rights ; and the danger of constructions of the constitution supplanting the letter of the constitution. To show what is meant by due process of law, as applied to the assessment of damages of the owner of land taken for public use, I refer to the practice under various highway acts. (*Van Schaick's ed. of Colonial Laws, pages* 166, 263, 488, 661, 722, 774, 793. 1

Jones & Var. R. L. 139.) Under these acts the damages were assessed by a jury. The same mode of assessing damages was required in the act incorporating the Inland Lock Navigation Company, passed in 1792. The damages to land upon laying out streets in New-York were formerly assessed by a jury. In 1807, the great system of embellishing that city was first invented. (*Laws of* 1807, *ch.* 103 ; *Laws of* 1809, *ch.* 51, *sec. 5,* and *Laws of* 1808.) The act of 1807, which directed the widening of Canal street, was the first act which authorized commissioners to assess damages in that city, instead of a jury ; but the act of 1809 required a jury to assess the damages, although the act of 1807 was still in force. When cessions of land were made by the state to the United States for fortifications, the mode adopted of assessing damages was by writs of ad quod damnum, which required the intervention of a jury. The only mode formerly used of assessing damages, where private property was taken, was by jury. This shows what was meant by the words due process of law, used in the constitution of the United States. It referred to such process of law as was then known and adopted. (4 *Dal.* 19. *Colton* v. *Wallace,* 3 *Dal.* 302. *Van Horne's Lessee* v. *Dorrance,* 2 *Dal.* 304.) The old constitution of this state required a jury in every case in which a citizen was to be deprived of his property. The old mode of assessing damages is still in force in the city of Albany. This mode is most congenial with the spirit of our government. In section 2 of 7th article of the old constitution of New-York, it is declared that the trial by jury in all cases heretofore used shall be inviolate forever. Until 1807, the uniform and invariable mode of assessing damages was by jury. The assessment of damages by a jury must evidently have been the process of law meant in the old constitution. And the plain and evident sense of the new constitution is, that the trial by jury should not be abolished in any case in which it was before used. The precedents of unconstitutional laws cannot vary the true construction of the constitution, as expounded by its framers at the time. There is another uncommon and void provision in this act of incorporation. It is the one which vests the fee of the land taken, in the company, although the company is not,

by the act, to endure beyond 50 years. The law contemplates that the commissioners will appraise the entire value of the land. If so, the owner can have no reversion of the land after the corporation expires. The new constitution, article 7th, sec. 10, adopts the common law, subject to the alteration of the legislature, but abrogates all laws repugnant to the constitution. (*See section* 13.)

These corporations, clothed with such extensive powers, will by and by become the rulers of their creators. In this act of incorporation there are no restrictions for the public benefit. The provision authorizing the legislature to modify, alter or repeal the act, does not confer upon the legislature the right of exercising this power, except for good reasons. Can such an act make this company the representative of the state in taking private property for public use ? Suppose this company capriciously refuses to convey passengers or merchandize, would there be any remedy for such an act ?

Admitting the law to be constitutional, the company has not shown such a compliance with the provisions of its act of incorporation as to authorize it to take the complainant's property. The licence given by the complainant to the company to take his land is of no avail, as he revoked it. The corporation was bound to comply with the act strictly. In case of naked powers, every prerequisite must be shown to have been complied with. (*Williams* v. *Peyton's Lessee*, 4 *Wheat.* 77.)

This is a proper case for an injunction. An injunction is the only adequate remedy. The injury to the complainant will be irreparable. A variety of suits must be brought at law. Where the remedy is not complete at law, an injunction will be granted. Here is no dispute as to the right, which is a cause of refusing an injunction until a decision at law. (*Reid* v. *Gifford*, 6 *John. Ch.* 197. *Watson* v. *Hunter*, 5 *id.* 169. *Jerome* v. *Ross*, 7 *id.* 315.) An injunction will lie where the remedy at law is not so perfect as in equity. (9 *Wheaton*, 733.) The provision in the United States constitution protecting private property applies to states, and is intended as a federal security. The New-York constitution of 1821 contains a like provision. The community has at different times been seised with a mania upon certain subjects. These have

been successively turnpikes, manufacturing companies, canals and rail roads. The meaning of the words *public use* cannot be made to depend upon the opinion of those who are interested on one side or the other. These words cannot be applied to private associations. Monopolies are odious; they resemble rank and nobility, and cannot come within the meaning of the words *public use,* contained in the constitution. The bill of rights is substantially incorporated in the new constitution; and the charter of privileges of 1683 was re-incorporated in the bill of rights. All the solicitude of the framers of the constitution for the preservation of these privileges will be of no avail if the doctrine contended for by the defendants' counsel prevails. For the legislature has only to pass a law and say the powers conferred are for the public use, and it is to be ruled so; and private property is to be taken for the object so arbitrarily declared to be for the public use, and the damages can be assessed not by a jury who would be liberal, but by persons in whose appointment the owner of the property had no agency. If this doctrine be sustained, every corporation may be clothed with power to take private property without the consent of the owner; for, with but few exceptions, all are in some degree for the public benefit. Is not an assessment of damages a trial, and one of great importance? Our courts have considered turnpikes as highways, and upon this ground have brought them within the provisions of the constitution. All the old acts in relation to highways required the assessment of damages by juries; and they ought to have a controlling influence upon this question, as the framers of the constitution had an agency in their passage, and they are presumed to have known what was the true construction of the constitution. The new constitution expressly abrogates all acts and parts of acts repugnant to such constitution. The framers did not intend or mean to sanction any act repugnant to the old constitution. This appears from the fact that similar provisions for the protection of private property are contained in both the old and new constitution. If it had been intended to dispense with juries in the taking of private property, the new constitution would so have expressly declared. The legislature cannot make an act constitutional by reciting

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

in it that the work therein authorized to be constructed, is for the public use. The court is bound to pass upon this question, and decide it according to some known established principle. The determination of the legislature as to this is not conclusive. There has been a practical exposition of the constitution on this point, which shows the cotemporaneous sense of the community. The legislature has never sanctioned the principle, that private property may be taken in any case, not for the public use. No act can be found authorizing the taking private property, other than for the public use. And never, until within a few years, has the legislature assumed to appoint commissioners to determine the damages. The old precedents ought to be held conclusive, that this can only be constitutionally done by jury. The admission that the act is valid, so far as it creates the defendants a corporation, does not render constitutional and valid those parts of the act which authorize the company to take private property without the consent of the owner. This company may have all the privileges granted; it may purchase and agree for and receive cessions of private property. But still it may not have power to take private property without the owner's consent. Banks are of public utility, and the utility to the public is the only principle upon which they are incorporated, yet they were never authorized to take private property. Colleges and academies are altogether of a public nature, and property is necessary for their establishment, yet they have never had conferred upon them the power of taking private property for their accommodation. Acts authorizing the draining swamps and drowned lands are passed upon the principle of preserving the public health, and to improve the property held in common. The case of *Rogers* v. *Bradshaw*, (20 *John. Rep.* 735,) was put upon the ground of necessity, that the taking the private property there was indispensable to the completion of the canal. Bridges and ferries are all connected with public higways, and are for public purposes ; and when private property is taken for their erection or establishment, it is for objects confessedly public.

When the convention of 1821 was called, my friends on the other side will admit that genuine republicanism

was triumphant. In the constitution then adopted is incorporated the bill of rights, and every act repugnant to that constitution is abrogated, and provision is therein made that the trial by jury shall forever remain inviolate. The assessment of damages by the clerk, on a note being a mere matter of computation, is not against my position. The trial by jury has always been a favorite of the people. I will not impeach the republican convention of 1821 by imputing to it the design of impairing the trial by jury, and of overruling the precedents of the good republican days of Gov. Jay. I refer to the case in 9 *Wheat.* 191, as to a true construction of the constitutional provision of taking private property, and as to its being a limitation or restriction of power. Private property is always taken upon the principle of necessity. The public have no remedy against this company if it neglects to keep the road in repair. It would not be indictable as turnpike companies are ; and there would be no remedy by throwing open gates as in the case of turnpikes. This is a private company, and the road is private property, and the company is no more indictable than a milling or a manufacturing company would be. The property at the expiration of the charter will not revert. There is no provision in the charter which is usual in turnpike acts, directing, that when the company shall be indemnified from their income, the road shall belong to the state. The act in relation to the Albany pier, (*Lansing* v. *Smith*, 4 *Wendell*, 1,) is not analogous to this act. That act was passed because a basin was necessary to facilitate the operations of the canal and to protect canal boats. All the cases where the damages were not assessed by a jury were cases of turnpikes, or where the property was taken by the consent of the owner. Because the objection to this mode of assessing damages has not been heretofore taken, it does not follow that if the objection had been made, it would not have been sustained. In the cases which have occurred, the land owners, by not raising the objection and by receiving the damages awarded, acquiesced in the unconstitutional mode adopted to assess such damages. (*Van Horne's Lessee* v. *Dorrance*, 2 *Dall.* 304.) In the case of private ways,

the owner of the land has an election to have his damages assessed by a jury or by commissioners. In the case of the dam alluded to, the damages were to be assessed by a jury. If an act of the legislature can thus violate a provision of the constitution, the legislature has only to go on step by step to sweep away all the provisions of the constitution.

Here is no part performance of an agreement for the complainant's property. There was no price fixed; which is necessary to an agreement; if there was a contract, why were the damages appraised? The case must be considered as one where there was no agreement for the land. The notice to the complainant of the time and place of the meeting of the commissioners to assess the damages, did not make the proceeding constitutional.

*A. C. Paige & B. F. Butler,* for the defendants. All the provisions of the act of incorporation have been complied with. The line of the road has been designated, and certificates of the same made and filed. No more land was taken than was indispensable for the construction and maintenance of the road. Notice was given to the complainant of the time and place of the appraisement of the damages. The sum awarded was deposited in the Mohawk Bank, as required by the act. The complainant cannot now take the objection that the provisions of the act have not been complied with, as he has not made that allegation in his bill. He should have specified the particulars in which the defendants have failed to comply with the act. The act required neither notice to the complainant of the appointment of the commissioners, nor his assent to their appointment. The affidavits show that an attempt was made to agree with the complainant as to the price of his land. If the complainant's assent to the line of this road has not been established, the question arises, had the company the power to take the complainant's land against his consent. We contend that the complainant did assent to this line? The objection that this assent was not in writing, is obviated by a part performance. Possession here has been taken by the company, by staking out the bounda-

ries of the road and running the line. This was a sufficient part performance to take the case out of the operation of the statute of frauds. The route of the road as designated is the most eligible that could have been adopted. The complainant does not complain of the amount of damages awarded to him, or that the commissioners were not disinterested. The act of incorporation, in conferring power upon the company of taking private property for the purposes of their rail road, violates neither the federal nor the state constitution; nor does it impair the obligation of any contract supposed to have been entered into between the state and the complainant. The provision in the state constitution authorizing the taking private property for public uses is not a grant, but a limitation of power. This provision recognizes the power in the legislature of taking private property for public uses, without rendering any compensation as a power resulting from the institution of government. So strong was this belief on the part of the American people, that they adopted the amendments to the United States constitution with the express view of taking this power from the general government. The parliament of Great Britain possesses the power of taking private property for public use without compensation; and all governments have this power, unless restrained. This was expressly held in the case of *The Gov. &c. of Cast Plate Manuf. Co.* v. *Meredith*, (4 *T. R.* 794.) Blackstone extols too highly the privileges of the British people. (*Note by Chitty to* 1 *Bl.* 139.) This doctrine was well understood by the American people at the formation of the state constitutions; and therefore it was that the provision prohibiting the taking private property without compensation to the owners was incorporated in the constitutions of Massachusetts, New-Hampshire, and several other states. The same provision was introduced, for the like reason, into the new constitution of New-York. But the provision in the United States constitution is not binding on the states, and only operates as a restriction upon the power of congress. (*Rogers* v. *Bradshaw*, 20 *John. R.* 106, *per Spencer, J.*) Some of the states have not this provision in their constitution. This is the case in South Carolina; and there it

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

has been held, (*Stark ads. M'Gowen*, 1 *Nott & Mc'Cord's S. Car. R.* 387,) that a state may take private property for public use without compensation. (*Vattel*, 1, 2, 103, 4. *Puff.* 64, *ch.* 7. *Domat's Public Law, book* 1, *tit.* 8, *sect.* 8.) The states representing the whole people are sovereign, and possess unlimited power in all cases except where they are restricted by either the federal or their own constitution. The legislature of a state, unless restricted by the state constitution, would even have power to take private property for private use. To show that the construction of this road is a public object and for the public use, and will benefit the public, we have the opinion of intelligent and disinterested citizens living in its vicinity, who state that it will promote the interests of Saratoga county and of the whole union, by leading to an intercourse of the citizens of all the states with each other, and by furnishing an easy and rapid mode of conveyance for invalids. But it is not necessary to look out of the charter for evidence that this road is for the public use, and is intended to effect an object or purpose of public utility. The opening of good and easy internal communications is one of the highest duties of government ; and such communications, when opened, are among the most useful of public accommodations. The opposite counsel admits that the road will be beneficial to the community, and that a great portion of the public will be accommodated by it ; but he contends that the land taken for its construction is not for the public use, because the corporation who is to make and use the road is a private corporation. He rests his whole argument upon this ground. It is true, that this corporation is not so much of a public corporation as a city, village or county, or as the regents of the university. Those corporations are, strictly speaking, public corporations, where there are no stockholders, or no emoluments resulting to the stockholders. As contradistinguished from them, this may be a private corporation ; but only as compared with them can it be so considered. Public corporations are described by Story, justice, in the case of *Dartmouth College v. Woodward*, (4 *Wheaton*, 668, 694,) in the following manner : " Strictly speaking, public corporations are such only as are founded by the government for public purposes, where

the whole interests belong also to the government—such as towns, cities, counties. So if a bank is created by the government for its own uses, whose stock is owned exclusively by the government, it is a public corporation. But a bank whose stock is owned by private persons is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge and turnpike companies." In all these cases the uses may be called public, but the corporations are private. This is not such a private corporation as many others; such, for instance, as manufacturing companies. Turnpikes, canals, rail roads, toll bridges, and ferries, as contradistinguished from the latter, are public corporations. For although they may be private, as contradistinguished from the strictly public corporations, yet the use may be public. (4 *Wheaton*, 669, *per Story, J.* 1 *Pickering*, 495, 6, *per Putnam, J.* 20 *John. R.* 742, *per Kent, Chan.*) A manufacturing company is a mere partnership to enable the partners to unite their capital ; but these companies are strictly private, as they are not compelled to make cloth upon the application of individuals. But there is a middle class of corporations, such as turnpikes, ferries, &c. where the uses are all public, although individuals are benefitted. (4 *Wheat.* 669, *per Story, J.*) Judge Story takes a distinction between the rights and interests of individuals who are stockholders, and the public uses of the corporation. Thus, turnpike, canal and bridge companies may be called private corporations, but the uses are all public. It has been repeatedly decided, that turnpikes, canals, bridges and ferries, although made by individuals or private companies, are entirely for the public use. In the case of *The State* v. *Town of Hampton*, (2 *N. H. R.* 25,) Woodbury, J. said, "All turnpike grants have been made on the hypothesis that lands taken for turnpike roads are taken for public purposes." (*Vattel*, *ch.* 9, *p.* 40.) And in *Charles River Bridge Co.* v. *Warren Bridge Co.*, (7 *Pick.* 495, 6,) Putnam J. held "that bridges and ferries are *publici juris*. A toll is granted for a service rendered to the public. Banks and insurance companies may discontinue and divide their stock when they please—paying their debts.

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

No individual can compel a bank to lend him money, or an insurance company to underwrite upon his ship; but the proprietors of the bridge or ferry are under great liabilities to the public—are compellable to permit the public to use them, on paying toll." (*See Enfield Toll Bridge Co.* v. *Connecticut River Co.* 7 *Conn. R.* 29, and *Rogers* v. *Bradshaw*, 20 *John. R.* 742, *per Kent, Chan.*)

It is admitted that private property may be taken without the owner's consent, for turnpike, bridge, and canal companies. The legislature of this state has incorporated about 1500 such companies; and a large number of such corporations have been granted by our sister states during the last 40 years. And by states whose constitutions contained the inhibition against taking private property, unless for public uses and upon rendering compensation. Where is the difference between such companies and this rail road company? Those companies are equally with this company authorized to receive all the tolls. The only difference is, that this road is not travelled by all persons with their own carriages. A rail road undoubtedly is less general than a turnpike, as a rail road can only be travelled by carriages adapted to it. It is however equally public as a turnpike, as to travelling in a particular way. Turnpikes cannot accommodate every mode of conveyance—as, for instance, boats; and canals cannot accommodate carriages. So on this rail road, ordinary vehicles cannot be used. As to the company's owning all the carriages, it is the very thing which renders a rail road beneficial. The act does not prohibit the carriages of individuals to be used on the road; it leaves the matter subject to the regulations of the company. The difference in the character of a rail road and turnpike renders the mode in which the rail road is to be used less general. This is a difference however in degree, and not in principle. To all persons who choose or wish to travel on this route in this way, the rail road will be open. In reference to that portion of the community, (and they will be numerous,) the rail road will be just as public and as free as the turnpike is to those who wish to travel by another mode of communication. Each is adapted to accommodate portions of the community. If the company should refuse to carry passengers, it would be a violation of its charter, and would amount to a forfeiture.

If permission should be given to individuals to use the road with their own carriages, would any one ever provide a vehicle for it ? If the company did not furnish the carriages, the public would not be accommodated, as the road can only be travelled by carriages adapted to it, and no man would ever think of procuring a carriage of this sort for his private use. The road can only then be rendered serviceable to the public by means of the carriages to be furnished by the company. If the state had made this road, they would have been obliged to provide the carriages. Yet, in that case, would any one have said that the use was not a public one. This test is decisive. From the peculiar character of these roads, every person could not use his own coach. The safety of the passengers renders this unavoidable. The whole road must be under the management of one company, so as to secure the removal of obstructions, and prevent the endangering of human life. This company will not have any power to oppress the public. It must charge one uniform price. If it should charge any individual an exorbitant price, an action would lie against the company, and it would amount to a misuser of its privileges. The court of chancery has also a superintending power over all corporations, by virtue of its general jurisdiction in all cases of abuses of trusts, to redress grievances and suppress frauds. (4 *Wheaton's Rep.* 676.) There is a further check upon this corporation, in case of an abuse of its powers. The legislature can repeal its act of incorporation. The corporation is by law compelled to keep the road in repair. If it neglects to keep it in repair, it will be liable to an indictment.

The question does not turn on the degree or extent of the advantage derived by the public, nor on the comparative or the superior advantage of this mode of communication. The true question is, is the object of the corporation calculated to promote the public interest ? If such be the character of the object, then that object is a public one. Formerly it was the practice to prefix preambles to corporation acts, setting forth the purposes and objects of such acts. This practice is now disused. If it had continued, the preamble to this act would have fully set forth the public objects of the corpora-

*margin:*
1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

tion. But the objects of the act, and the motives of the legislature in passing it, are apparent upon its face. The company is to construct and maintain a rail road between two points; it is to regulate the tolls; it is required to expend $50,000 in two years; and is to complete the road in five years, or it forfeits its charter; and one condition of its incorporation is, that it is restrained by the general provisions of the revised statues from exercising any other powers than those expressly conferred on the corporation. The legislature has also the power of altering and repealing its charter. There is likewise another condition upon which this corporation holds its privileges. If it does not fulfil the objects for which it was incorporated, and is guilty of a nonuser or misuser, it forfeits its charter. (2 *R. S.* 583.) Here is not only a right conferred, but a duty imposed; and the right to receive tolls depends upon the performance of the duties so imposed. It is the duty of the government to open these internal communications. The difference between such a company as this and a bank, insurance company, &c. is founded upon the fact that the latter is not granted upon so full a consideration moving from the stockholders, and the franchise conferred upon it is more in the nature of a gift from the state. The right of taking tolls is a public franchise, an attribute of sovereignty. This is one of those corporations which are presumed to be founded upon an adequate consideration, received by the government for the franchises granted. It pays a complete equivalent. (*Newburgh Turnpike Co.* v. *Miller,* 5 *John. Ch. R.* 101. *Bank of Newbern* v. *Taylor,* 2 *Murphy's R.* 266. *Enfield Toll Bridge Co.* v. *Connecticut River Co.,* 7 *Conn. Rep.* 48.) If the legislature believed that the construction of this rail road would be beneficial to the public, it should have been made by the state, or the counties should have been directed, or commissioners appointed to make it; or the requisite power should have been delegated to individuals or a corporation for that purpose. The legislature had a discretion as to the means of effecting the object. The latter is the most common mode now adopted of opening internal communications. This was the only mode in which they could have been opened in the infancy of our country.

In England, rail roads have been altogether constructed by corporations; so also in this country. If there had been a reservation in the charter that the state might take the road, it would have, beyond all question, been deemed a public improvement. It was so held as to the Albany Pier Company, in *Lansing* v. *Smith*, (4 *Wendell*, 1.) And if the state had made this rail road, it would have been a public improvement, and the taking of private property for that object would have been for a public purpose. It is not necessary that the state should receive the tolls, or pay for the work, to make it a public improvement. The receipt of the tolls would undoubtedly be for the public advantage; but the advancement of the general interests of the citizens would be the same, whether the road was made by the state or a private company. If the state had made the road, it would have taken the hazard of the tolls, being unequal to the interest of the expenditure and the amount paid for repairs. In the present case the state avoids this hazard, although it does not possess the possible advantage of the tolls exceeding the interest and repairs. Can an object be less a public one because the state is relieved from all hazard as to loss? But the receipt of tolls cannot vary the question of the public character of this road. Would the Erie canal have been less a public improvement if no tolls had ever been charged? or would it be less so now if the tolls should be relinquished? The receipt of tolls, where the improvement is made by the public, is neither the sole or principal advantage; the accommodation to the public, the facilities to trade, the increased value of property and the general utility are the great objects. Another argument in favor of the public character of rail roads made by private corporations, and of their being public improvements, is derived from the practical exposition of this question on the part of the legislature and the public, from the numerous incorporations of rail road companies in many of the states since 1824, and all granted upon the ground that the country would be benefitted by their construction, and more so if they were made by corporations than by the state. Is the court prepared to say that all these laws are void? (*See Laws of Mass. of* 1830, *p.* 416, 428, 434, 497.) Fifteen or twenty rail road companies have been in-

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

corporated in that state, with power to take private property in the same manner as is done for highways. Most, if not all the laws of the other states incorporating rail road companies authorize them to take private property. (*Laws of Pennsylvania of* 1829–30, *p.* 241. *Laws of Delaware of* 1829, *p.* 316, 322. *Laws of Maryland of* 1828, *ch.* 139, § 11. *Laws of Virginia of* 1828, *p.* 87, 89, *and of* 1829, *p.* 61. *Laws of Kentucky of* 1828, *p.* 81. *Laws of District of Columbia of* 1831, *ch.* 84.) If the act in question is unconstitutional, all the acts referred to are so. In a doubtful case, courts will not pronounce a law unconstitutional; as the judiciary is only a co-ordinate branch of the sovereign power, and the members of the legislature are sworn to support the constitution equally with the judges.

It is objected that no rates of toll are established in the act in question, and that this company is not bound by any provision to keep the road in repair, and is under no restriction to secure the public use. If this be true, it does not prove that the whole act is unconstitutional, although as to some of its details it may be imperfect. The legislature under the reserved power may still supply the defects, if any, and add the requisite restrictions in a new act. If the legislature have the power to repeal the act, they have the power to amend it; if they find the corporation does not fulfil its end, the corporation is also liable to a forfeiture of its charter for misuser or nonuser.

As to the objection that the fee of the land is to be vested in this corporation: At the expiration of the corporation the land must either revert to the original owner or belong to the public. But as the owner has been paid the full value of the fee, if the land does not revert, he will have no right to complain in equity; if it does revert, he has no reason to find fault. The legislature by a law of 1828 dissolved the Farmers Turnpike Company and devoted the turnpike to the public use, by declaring it a public highway. But if the vesting the fee of the complainant's land in this company, as the corporation is only to endure 50 years, is a defect in its charter, it cannot render the whole charter void. If the legislature have in this particular transcended its power, the court will hold the provision vesting the title in the company good

for 50 years, the duration of its charter, although beyond that it might be void ; that is, void only for the excess. This is a universal principle of law. The laws as to private ways, which have been in force since 1772, may be referred to, to show that power exists in the legislature to confer the power claimed in this case. The provision in 1 *R. S.* 517, § 79, authorizing the laying out of private ways, upon the application and for the sole benefit of an individual, over the land of another, is only a re-enactment of similar provisions in former laws, which have been in force since the year 1772. The first act to be found was passed by the colonial legislature on the 12th March, 1772. (2 *Van Schaick's ed. of Laws*, 664, § 19, *p.* 723, § 2, *Act of 6th February*, 1773. *Jones & Var. ed.* 139, § 2, *passed 4th of May*, 1784.) The law authorizing the laying out private roads extends the principle of taking private property farther than we contend for ; for it amounts to taking the private property of one individual without his consent—not for the use of the public, but for the private use of another citizen. Yet these laws authorizing the laying out private ways are sustained as constitutional by the great law of necessity, that the owner of land must have access to it. In this view, these private ways are considered as subserving the public interest. The whole public are supposed to be interested in sustaining the principle of the right of giving every citizen an access to his own property. Upon this law of necessity it is that the purchaser of land in the centre of the grantor's farm has, by implication, a right of way to it over the land of the grantor. If the right to take private property for private ways can be sustained, then we stand in this suit upon impregnable ground. The laws authorizing the draining of drowned lands and swamps, also sanction the principle for which we are contending. Such laws have been frequently passed by our legislature, and authorize the entry upon, and draining of lands of individuals without their consent ; and they prescribe means to compel a contribution by such owners to meet the expense. (*Phillips* v. *Thompson*, 1 *John. Ch. R.* 143.) A law of this character was passed in 1804, authorizing the draining of lands in Orange county. (4 *Web. & Skin. ed. Laws*, sess. 27, ch. 91. See al-

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

*so Laws of* 1818, *p.* 115 ; *Act of 6th March,* 1807, *sess.* 30, *ch.* 25 ; *Act of April* 15, 1826, *p.* 247 ; and 2 *R. S.* 548.) Laws have also been passed, authorizing the owner of a mill to overflow the land of another by his dam. (2 *Kent & Rad. ed. of Laws, p. 49, sect. 3.* See the law also in relation to the *Albany Water Works,* and the act to drain and reclaim the marshes in the valley of the Seneca river, passed April 18th, 1825.) Several questions have arisen under these laws in our courts, but the objection has never been taken that they were unconstitutional. The power of the legislature to pass such laws was admitted in *Belknap* v. *Belknap,* (2 *Johns. Ch. R.* 468.) These laws were passed also during the existence of the council of revision, a body expressly constituted to object to unconstitutional laws. And for many of these laws, the learned counsel opposed to us must have given his vote either as member of the state senate or assembly ; for some of these laws were passed during those good republican days of Gov. Jay, alluded to by the learned gentleman. These laws and also the laws relative to private ways are of a less public character than rail roads.

The point raised on the other side, that the act incorporating the defendants impairs the obligation of contracts, if a valid objection, cannot be raised in this suit, as the complainant has not stated in his bill the facts upon which such an objection might be founded. He should have set forth that he obtained his land from either the British crown or the state. This cannot be inferred from the fact of the complainant's being the owner of the land, as there are other modes of acquiring title to lands ; as by possession, or the title may have been obtained under the Dutch laws, and merely confirmed by the state. And if the complainant has a grant from the state or the British crown, he should have set it out in his bill. It may contain a reservation in favor of the state to construct roads over the land granted ; but if his grant is without any express exceptions or reservations, he nevertheless took it under the implied reservation that the state might take the land granted for public purposes. This doctrine was never disputed. The provision in the United States and state constitutions, declaring that private property shall not be taken except for

*1831.*

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

public purposes, implies that all lands may be taken for such
purposes. This is not denied on the other side. If the con-
struction of this road is then a public object, the argument is
at an end. The cases referred to by the learned counsel, rel-
ative to some state laws impairing certain grants previously
made, were cases where the grants had been actually made,
and then had been altered or abrogated without compensation.
(2 *Dall.* 304. 9 *Cranch,* 43. 4 *Wheat.* 518. 8 *id.* 1.) To
show that the members of the legislature are the judges of
the question, whether a purpose is public, or a contemplated
work is beneficial to the public or not, we refer to the case of
the *Bank of Newburn* v. *Taylor,* (2 *Murphey's N. Car. R.* 266,
per *Hall, J.* ; 4 *Litt. Ken. R.* 327.)

Assuming that this act of incorporation is constitutional, it
is objected that the mode prescribed in it of ascertaining the
compensation is unconstitutional ; that this mode is contrary
to that provision of the constitution which requires due process
of law ; it being contended that the damages of the owner
can only be assessed by a jury ; this being the due process of
law, within the meaning of the constitution. This objection
assumes the use to be a public one, and that the legislature in-
tended to give compensation. We contend that the provis-
ion in the constitution referred to does not apply to the case
of taking private property for public uses, but to suits in courts
of justice ; to some known and fixed mode of judicial pro-
ceeding. The mode of ascertaining the compensation to the
owner, where private property is taken for the public use, is left
to the discretion of the legislature. The provision in the con-
stitution as to taking private property, only means that private
property shall not be taken, except by some regular proceed-
ing ; and unless a just compensation be made, under some
equitable mode of assessment, to be provided by law. (*Gard-
ner* v. *Village of Newburgh,* 2 *John. Ch. R.* 166.) It cannot
mean a regular judicial proceeding, as there can be none in
cases of this kind. The writ ad quod damnum does not ap-
ply ; though used in some cases at common law, it was not the
general mode adopted in England, in cases of roads. (*Lam-
phin* v. *Jackson,* 1 *Paine's C. C. R.*)

As to the provision in relation to a trial by jury, in the new
constitution, see *Barker* v. *Jackson,* (1 *Paine's C. C. R.* 559;)

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

a like provision was in the old constitution. This provision, as to trial by jury, does not apply to cases of taking private property for public uses ; it refers to trials in a suit in court. The mere assessment of damages is not a trial. This is not its approved legal sense. The learned counsel has referred to the highway acts under the colonial government, as evidence of what was meant by due process of law. Because an assessment by a jury is a fit mode, it does not follow that this is the only mode of assessing the damages ; or that the framers of the constitution so intended it. There is evidence that they intended to leave the mode to the discretion of the legislature. If their intention was that the damages should be assessed only by a jury, why did they not so declare in the constitution ? Such a provision is in the state constitution of New-Hampshire. Anterior to the 1st January, 1822, we have the authority of the council of revision, that the mode prescribed in this charter is a legal mode of assessing the damages. In 1798, some laws were passed, which provided a like mode of assessment as is contained in the defendants' charter. (*See* 2 *Kent & Radcliff's ed. of Laws*, 392, § 5, *and* 405, 414, § 4, *and* 420. *Also, Laws of* 1795, *vol.* 2, *p.* 37, *ch.* 37. *Laws of* 1796, *Act incorporating the Albany Water Works Co.*) So the same mode of ascertaining the compensation was adopted in the canal laws. When, then, the framers of the new constitution provide that private property may be taken, &c. and are silent as to the mode of assessing the owner's damages, and the legislature from 1798 to 1822 had in numerous cases adopted this mode of assessing the damages, it cannot be contended that the framers of the constitution did not intend to sanction this mode. The new constitution contains, in the same words, the provision of the old constitution as to the trial by jury, in face of the practical exposition of the old constitution of New-York. All arguments as to what is due process, fail after this practical exposition. And the precedents since 1822 cannot be got over, except by supposing that the legislature has, in all these cases, violated the constitution. (*See Laws of N. Y.* 1823, *p.* 85, § 13. *Gilbert* v. *Columbia Turnpike Co.* 3 *John. Cas.* 107.) We can also refer to the practice of the Brit-

ish parliament on this subject. Its members, in passing laws, providing other modes than a trial by jury, of assessing the damages of owners of private property, supposed they were acting in conformity to the bill of rights and magna charta. The uniform practice of the legislatures of our sister states show, beyond question, the sense of the American people, that the mode of assessment prescribed in this act is constitutional. In Massachusetts and New-Hampshire, lands for turnpike roads are taken in like manner as is provided in case of highways. (*Laws of New-Hampshire of* 1794, *vol.* 1, *p.* 327, *and of* 1791, *p.* 309.) In Vermont, the damages in cases of turnpike roads, by a law of 1826, p. 96, sec. 3, were directed to be assessed by a committee appointed by the legislature ; and by a law passed in 1801, p. 585, by a committee to be appointed by a county court. In a rail road act of New-Jersey, (*Laws of* 1829, *p.* 87,) the damages were directed to be assessed by commissioners to be appointed by the supreme court. In Pennsylvania, damages in cases of turnpikes and rail roads are assessed in the one case by three freeholders, to be appointed by the county court, and in the other by five viewers, to be appointed by the court of common pleas. (*Laws of Pennsylvania of* 1792, *p.* 170. *id.* 1829, *p.* 624, 643.) A similar mode of assessing damages in cases of turnpikes and rail roads has been adopted in many other states. (*Laws of Delaware, vol.* 4, *p.* 418, 643. *Laws of Virginia of* 1829, *p.* 87, 89, 61. *Laws of S. Carolina of* 1809, *p.* 57, 58. *Laws of Kentucky of* 1828, *p.* 81. *Laws of S. Carolina of* 1744, *p.* 121. *Laws of Delaware,* 25. *Laws of Ohio of* 1808, *p.* 212. *Laws of Pennsylvania, vol.* 6, *p.* 283, 4, § 14. *Laws of* 1810 *of Congress, ch.* 44, § 6, *and ch.* 45.) In some of the states the mode of assessing damages is as various as it is in this state. Sometimes the mode adopted has been by jury, sometimes by commissioners appointed by the legislature, or some executive officer, or by a court. The same question of constitutionality started in this suit, would arise under all the laws referred to, where the mode of assessment was not by a jury. The concurring sense of our own and our sister states on this subject is, that the legislature has the power of prescribing the mode of assessment. In *Barker* v. *Jackson,* (1 *Paine's C. C. R.* 559,) the general doc-

trine is laid down, that the construction given to the constitution by the nation ought to be received as the true construction ; that the general usage of the states is the best interpreter of the constitution. This is the best mode of arriving at the intention of the people, who are supposed to have made the constitution. The practice of the American people is the best authority to determine what are the principles of free government. In *Stuart* v. *Laird*, (1 *Cranch*, 299,) it was held that a cotemporary exposition of the constitution adopted and acquiesced in for a period of years fixes the construction, and courts will not shake or control it. (*Elmendorf* v. *Taylor*, 10 *Wheat*. 159.) Where a mode is provided in the law authorizing the making of a canal, of assessing the damages of those who are injured in their property, it was held, in *Stevens* v. *Middlesex Canal*, (12 *Mass. R.* 466,) that no action for such injury lies at the common law. (*Stowell* v. *Flagg*, 11 *Mass. R.* 364. *Callender* v. *Marsh*, 1 *Pick*. 430. *Jackson* v. *Winne*, 4 *Little's R.* 327, 8.)

Notice to the complainant of the application to the governor to appoint commissioners was not necessary. This objection does not affect the constitutional question. There is no pretence here that improper persons were appointed. The deposit of the amount of the complainant's damages in the Mohawk Bank is complained of. There can be no ground for this complaint. This was a secure place of deposit. This bank is subject to the bank law. The appointment of a bank as agent to receive the complainant's money rested entirely in the discretion of the legislature. The selection of a bank by law as a place of deposit of money belonging to another is not new. In 1813, the New-York State Bank was by law appointed to exercise the duties of treasurer, on his death, during the recess of the legislature. If there are any doubts about the constitutionality of this act, the court is bound to decide in favor of the defendants. If the decision should be against them, the injury to them and to the public would be irreparable. Not so, if the decision is against the complainant ; as he can be compensated in money. In *Rogers* v. *Bradshaw*, Chancellor Kent held a canal act to be valid, although it contained no provision for compensation to the own-

er of the land taken.    If this act was defective in this respect,     1831.
the legislature, under the clause reserving the right to amend
the act, could remedy this defect by an amendment.    The     Beekman<br>v.<br>Saratoga and<br>Schenectady<br>Rail Road Co.
imaginary value put by the complainant upon his land can-
not be considered.    This consideration and the complainant's
interest must yield to the public benefit.    There is no allega-
tion in the bill that the award was below the real value of the
land.

On the whole, this act is constitutional in its principles.    It
is constitutional in the mode of ascertaining the compensation
of the owners of the land taken.    At all events, it is not a
clear, plain case of violation of the constitution.    In a doubt-
ful case the court will not interfere ; because the legislature
are as much sworn to support the constitution as the court.
(*Fletcher* v. *Peck*, 6 *Cranch's R.* 128.    *Ex parte McCollum*, 1
*Cow. R.* 550.)    Before a judge can rule an act of the legisla-
ture unconstitutional, he must feel a clear and strong convic-
tion that it violates the constitution.    (*Hughes* v. *Trustees of
Merton College*, 1 *Ves.* 88.)

Private rights must give way to the permanent interest of
the public, upon fair and reasonable compensation, (*Per Ch.
Kent*, 20 *John. R.* 738 ;) and every interpretation which
leads to defeat the purposes of the statute is to be avoided.
(*id.* 740.)    Chancellor Kent, in same case, says, that turnpike
roads are made entirely for the public use, and that the commu-
nity have a deep interest in their construction and preservation.
So this rail road is expressly made for the convenience of the
public, and entirely for the public use.    (*2 New-Hampshire
R.* 25.)

Statutes made for the public good, and for general and ben-
eficial national purposes, are to receive a liberal construction,
and to be so expounded as to attain the end.    They must be
so construed as not to advance a private, and destroy the pub-
lic interest, but always to advance the public interest, doing as
little damage as possible to the private interest.    (*Jerome* v.
*Ross*, 7 *John. Ch. R.* 342.)

THE CHANCELLOR.    There can be no doubt in this case of
the right of the company to lay out the road in the manner
they have done, and to take the property of the complainant

1831.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

for that purpose, provided the authority given by the act and the mode of compensating the owners of lands through which the road is to run are not in violation of the constitution of this state. Even if the validity of this act were doubtful, I am not prepared to say the verbal consent proved by two or three witnesses, and acted on by the agents of the company, would not be sufficient to preclude the complainant in a court of equity from raising that question. There is no doubt that it was competent for the legislature to authorize the company to agree with the owners of lands through which the road was to run for a conveyance or donation of the lands necessary for that purpose ; and it would be both inequitable and unjust for an individual who had consented to give the site of the road provided it should run through his land, to retract that consent after the company had, in reference to such agreement, contracted with the owners of other lands on that particular route. And if such consent was not in fact retracted before the directors of the company had made their certificate of location, so as to preclude themselves from laying out the road elsewhere, it would be the duty of this court to compel a specific performance of the verbal agreement made with them before that time. I infer, however, from the affidavits in this case, that the complainant altered his mind, and retracted his consent to the location of the road on his premises at any place west of the barn, before the second of September, when the certificate of location was signed by the directors.

The constitution of the United States does not come in question in this cause. It is admitted that the complainant held the land in fee ; and probably under a title derived from the crown, to the rights of which the people have now succeeded. A law declaring the grant from the crown void, and divesting his title on that ground, would impair the obligation of the contract. But it was no part of the contract between the crown and its grantees or their assigns, that the property should not be taken for public use, upon paying a fair compensation therefor, whenever the public interest or necessities required that it should be so taken. All separate interests of individuals in property are held of the government under this tacit agreement or implied reservation. Notwithstanding the grant

to individuals, the *eminent domain*, the highest and most exact idea of property, remains in the government, or in the aggregate body of the people in their sovereign capacity; and they have a right to resume the possession of the property, in the manner directed by the constitution and laws of the state, whenever the public interest requires it. This right of resumption may be exercised not only where the safety, but also where the interest or even the expediency of the state is concerned; as where the land of the individual is wanted for a road, canal or other public improvement. The only restriction upon this power, in cases where the public or the inhabitants of any particular section of the state have an interest in the contemplated improvement as citizens merely, is that the property shall not be taken for the public use without just compensation to the owner, and in the mode prescribed by law. The right of *eminent domain* does not however imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer. And if the legislature should attempt thus to transfer the property of one individual to another, where there could be no pretence of benefit to the public by such exchange, it would probably be a violation of the contract by which the land was granted by the government to the individual, or to those under whom he claimed title, and repugnant to the constitution of the United States. But if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of *eminent domain*, and to authorize an interference with the private rights of individuals for that purpose. (2 *Kent's Com.* 340.) It is upon this principle that the legislatures of several of the states have authorized the condemnation of the lands of individuals for mill sites, where from the nature of the country such mill sites could not be obtained for the accommodation of the inhabitants without overflowing the lands thus condemned. Upon the same principle of public benefit, not only the agents of the government, but also individuals and corporate bodies,

1331.

Beekman
v.
Saratoga and
Schenectady
Rail Road Co.

have been authorized to take private property for the purpose of making public highways, turnpike roads, and canals; of erecting and constructing whares and basins; of establishing ferries; of draining swamps and marshes; and of bringing water to cities and villages. In all such cases the object of the legislative grant of power, is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government, or through the medium of corporate bodies, or of individual enterprize. And according to the opinion of Chief Justice Marshall, in the case of *Wilson* v. *The Black Bird Creek Marsh Company*, (2 *Peters' Rep.* 251,) measures calculated to produce such benefits to the public, though effected through the medium of a private incorporation, are undoubtedly within the powers reserved to the states, provided they do not come in collision with those of the general government. It is objected, however, that a rail road differs from other public improvements, and particularly from turnpikes and canals, because travellers cannot use it with their own carriages, and farmers cannot transport their produce in their own vehicles; that the company in this case are under no obligation to accommodate the public with transportation; and that they are unlimited in the amount of tolls which they are authorized to take. If the making of a rail road will enable the traveller to go from one place to another without the expense of a carriage and horses, he derives a greater benefit from the improvement than if he was compelled to travel with his own conveyance over a turnpike road at the same expense. And if a mode of conveyance has been discovered by which the farmer can procure his produce to be transported to market at half the expense which it would cost him to carry it there with his own waggon and horses, there is no reason why the public should not enjoy the benefit of the discovery. And if any individual is so unreasonable as to refuse to have the rail road made through his lands, for a fair compensation, the legislature may lawfully appropriate a portion of his property for this public benefit, or may authorize an individual or a corporation thus to appropriate it, upon paying a just compensation to the owner of the land for the damage sustained. The objection that the cor-

poration is under no legal obligation to transport produce or passengers upon this road, and at a reasonable expense, is unfounded in fact. The privilege of making a road and taking tolls thereon is a franchise, as much as the establishment of a ferry or a public wharf and taking tolls for the use of the same. The public have an interest in the use of the rail road, and the owners may be prosecuted for the damage sustained, if they should refuse to transport an individual, or his property, without any reasonable excuse, upon being paid the usual rate of fare. The legislature may also from time to time regulate the use of the franchise and limit the amount of toll which it shall be lawful to take, in the same manner as they may regulate the amount of tolls to be taken at a ferry, or for grinding at a mill, unless they have deprived themselves of that power by a legislative contract with the owners of the road.

The mode of ascertaining damages by commission has been adopted by the legislature in a great variety of cases; and I can see nothing in the provisions of the constitution which render such a course exceptionable. It was well known to the framers of the new constitution that such had been the practice in relation to the assessment of damages for private property taken for the Erie and Champlain canal, and for a great number of turnpike roads, as well as for other public uses. When, therefore, the constitution provided that private property should not be taken for public uses without just compensation, and without prescribing any mode in which the amount of compensation should be ascertained, it is fairly to be presumed the framers of that instrument intended to leave that subject to be regulated by law, as it had been before that time; or in such other manner as the legislature in their discretion might deem best calculated to carry into effect the constitutional provision, according to its spirit and intent.

The provision of the constitution which declares that the right of trial by jury in all cases in which it has heretofore been used shall remain inviolate forever, relates to the trial of issues of fact in civil and criminal causes in courts of justice, as is evident from what follows this provision in the same section; and it has no relation to cases of the kind now under consideration. Although the writ ad quod damnum had

sometimes been used for the purpose of assessing damages where individual property was taken for public use, yet that was never considered a jury trial within the meaning of the constitution. There is no doubt that it is a very proper mode of estimating damages in such cases; and probably where a single assessment was to be provided for, it would be much the most judicious and satisfactory mode of fixing the amount.

I have no doubt of the constitutionality of the statute under which the property of the complainant has been taken; and as all the requisites of the statute have been complied with, this property has been taken by due course of law, and after making just compensation therefor. From the moment that compensation was paid or deposited as the law had directed, the right to this property was absolutely vested in the defendants for the use of the rail road, and they have a perfect right to enter upon it and appropriate it to that use.

The order to show cause why an injunction should not be issued must be discharged with costs, and the temporary injunction heretofore granted in this case must be dissolved,