Cornelius L. Hardenburgh, James S. Nevius, Abraham Suydam, and others, v. The Farmers and Mechanics' Bank of New-Brunswick, and others.

Upon application for an injunction, where notice is given, and the parties are heard upon the application, affidavits taken exparte, and without notice, may be read upon the hearing.

If the bill be filed, the defendant may put in an answer, and use the answer on the hearing, not as an answer, but as an affidavit.

Where the first election of directors of a bank is authorized to be held upon a call made by commissioners appointed by the act, it is not essential that the call should be the result of any formal order of the commissioners.

Where the original notice is in the hand-writing of the secretary of the commissioners, he being one of them, and the names of the other commissioners are signed by him, if the notice is published and in no way disavowed by the commissioners, it will be deemed their act.

After the organization of the company by the stockholders, the powers of the commissioners are at an end.

The commissioners cannot, after having advertised a meeting of the subscribers for the choice of officers, as specified in the act, adjourn or postpone the election at their pleasure.

The subscribers acquire under the notice a right to hold the election at the time appointed, and to come into possession of the property they have invested, and as a general rule, the commissioners have, after that, no right to interfere against the will of the subscribers.

If the commissioners, after calling a meeting of the subscribers, order the election postponed, and the subscribers, nevertheless, refuse to postpone, and proceed with the election; the election will not be thereby avoided, unless in the opinion of the court a postponement was clearly necessary.

But if any considerable number of subscribers had been deprived of their elective franchise in consequence of the postponement, would the election be avoided ?—*Quere.*

The commissioners have a right to the custody of the money paid into their hands ; but if their treasurer wrongfully withhold it from them, that is no ground for postponing an election by the stockholders.

The court cannot set aside an election for a mere irregularity, nor because the expenses of the commissioners were not paid.

To authorize an injunction to prevent an instalment being paid in, the court ought to be satisfied that the election was entirely without authority, and void.

The bill in this cause was exhibited on behalf of the receivers and certain of the stockholders of the Farmers and Mechanics'

[Hardenburgh et al. v. Farmers & Mechanics' Bank of N.Brunswick et al.]

Bank of New-Brunswick; praying, among other things, that the president and directors of the said company be restrained by injunction from calling in or receiving an instalment of the capital stock of said company, and from declaring the first instalment forfeited in case of non-payment, and also from calling in any other instalment until the further order of the court. Upon exhibiting the bill, the chancellor directed notice of the application to be given, and a copy of the bill to be served on the defendants. The cause came on for hearing, pursuant to notice, on the 6th day of July, 1834, upon the bill, and *exparte* affidavits on the part of the defendants, the bill not having been previously filed. The nature of the bill is fully stated in the opinion of the chancellor.

*C. L. Hardenburgh* and *Wall*, for complainants, in support of the motion.

*Scott* and *I. H. Williamson*, contra.

THE CHANCELLOR. On the twenty-fifth of February last, the legislature passed an act to incorporate the Farmers and Mechanics' Bank of New-Brunswick, with a capital of one hundred thousand dollars, and liberty to increase it to two hundred thousand dollars. The sum of fifty thousand dollars was to be subscribed and actually paid in, before the bank should commence business. Twelve commissioners were appointed to receive subscriptions for the stock, and the sums subscribed were directed to be paid in the following manner, viz.: five dollars on each share at the time of subscribing, to the commissioners; and the remainder in such instalments, and at such times, as the president and directors should appoint. The commissioners, or any seven of them, were authorized, as soon as two thousand shares should be subscribed, to call a meeting of the subscribers at New-Brunswick, by giving at least three weeks previous notice in the newspapers printed in that city; at which meeting the subscribers should choose from among themselves eleven directors, to serve

until the second Monday in May, 1835, and that the said directors should choose from their own number, one to serve as president.

The bill presented in this case, states, that two of the commissioners declined acting; that eight of the remaining ten met in the city of New-Brunswick, on the 4th of March, 1834, and organized themselves into a board for the purpose of performing the duties and executing the powers given them by the said act. Cornelius L. Hardenburgh was appointed chairman, and Littleton Kirkpatrick secretary. And the board, at a meeting held on the 8th day of March, ordered that books of subscription for the capital stock of said bank, should be opened on the first Wednesday in April then next, and remain open for ten days in succession, unless the whole amount of the capital stock should be sooner subscribed. Of this order due notice was given in the public newspapers of the city. The board again met on the first day of April, and then ordered that any person subscribing to the capital stock of the corporation, should, at the time of subscribing, pay five dollars on each share subscribed for. They appointed five of their number a committee to receive subscriptions, and also appointed David Mercereau their treasurer to receive the moneys which should be paid by the persons subscribing. The books of subscription were opened at the time appointed, and were kept open for ten days; during which time there were subscribed two thousand seven hundred and sixty shares. Each person at the time of subscribing, paid into the hands of the treasurer five dollars on each share, amounting to thirteen thousand eight hundred dollars, which the said treasurer received from the board of commissioners as their treasurer, and for the commissioners. The board met again on the 12th day of April, at which time the chairman of the board reported that the books had been opened pursuant to notice; that two thousand seven hundred and sixty shares of the capital stock had been subscribed, and that the subscription money which had been paid, amounting to thirteen thousand eight hundred dollars, was in the hands of the said treasurer, subject to the order of the board. And thereupon, a committee of three was appointed,

whose duty it was made, in connexion with the treasurer, to take charge of the said subscription money, and deposit the same in the State Bank at New-Brunswick, and take a certificate of such deposite. On the third of May the commissioners again met, and the committee last mentioned reported that they had called at the residence of the treasurer, and did not find him at home, and that he afterwards informed the chairman of the committee that he had deposited the money in a bank of the city of New-York. On the 16th of April, a notice was published in the newspapers of the city, that a meeting of the subscribers would be held on Tuesday the 8th day of May, at 10 o'clock, A. M. to choose directors to manage the concerns of the institution. The notice appeared with the names of all the commissioners affixed to it, but was published without any previous meeting called, and without authority from any seven of them. At the meeting of the 3d of May, above mentioned, the board, after hearing the report of their committee, appointed with the treasurer to deposit the subscription money in the State Bank, that the treasurer had deposited the said money in a bank in New-York, and not knowing that the same was true, or in what bank the said deposit had been made, or whether the said moneys were subject to the order and control of the board of commissioners, made an order, that the treasurer produce before the board, on the 6th day of May then next, the said money, or a proper certificate that the same was deposited to the credit of the commissioners. On the said 6th day of May, the said commissioners met; and although the order of the 3d of May had been duly served on the said treasurer, he failed to appear ; nor did he produce before the commissioners the said money, or any part thereof, or any certificate concerning the same. Under these circumstances, the board felt unwilling that an election for directors should take place, and being advised that the notice which had been given was illegal, and desirous of being better advised in the matter, they ordered the election for directors postponed to the 22d day of May. This order was published in the public newspapers in the city.

[Hardenburgh et al. v. Farmers & Mechanics' Bank of N. Brunswick et al.]

On the 16th day of May the board of commissioners met, and being of opinion that, under the sixth section of the act, the original call or notice for a meeting of subscribers to choose directors was illegal—the same not having been made by the board, or any seven of them, they came to the following resolution, viz. : " Whereas it appears to the commissioners, that the original order for holding the election for directors of the Farmers and Mechanics' Bank of New-Brunswick, was not made in accordance with the terms of the charter ; and whereas the moneys paid by the subscribers to the treasurer, have not been placed under the control of the commissioners, pursuant to an order for that purpose ; therefore, resolved, that the election for directors, which was postponed to the 22d instant, be further postponed indefinitely, and that public notice thereof be given in the newspapers of this city, by the publication of this order."

This resolution was published in one of the newspapers of the city ; the publisher of the other paper omitted and neglected to publish it. Notwithstanding this resolution, certain of the subscribers met on the said 22d day of May, and chose eleven directors, all of whom save one accepted the appointment. These directors afterwards appointed James F. Randolph president, Lewis Carman cashier, and David Mercereau bookkeeper. Before the election was gone into, the electors, or a very large majority of them, were informed that the election had been postponed by the board of commissioners, for the reasons before mentioned, and they were requested not to proceed with the election until the treasurer had properly accounted for the moneys received by him.

The bill then charges, that the election was not in pursuance of the laws ; that it was conducted without rightful power and authority, and was in violation of the vested rights and interests of the other subscribers, and contrary to equity and good conscience. It charges, that the voters had not the requisite certificates to qualify them as voters ; and that the inspectors, after having closed the polls and adjourned, opened them to receive other votes, and that such other votes were actually received.

[Hardenburgh et al. v. Farmers & Mechanics' Bank of N.Brunswick et al.]

The bill further charges, that the said treasurer still detains the said sum of money from the commissioners, in violation of the trust under which he received it, and that those who voted at the election combined together to get the management and con-trol of the institution, contrary to law, and the just rights and interests of the complainants.

It also states, that the president and directors have ordered an instalment of five dollars on each share subscribed for, to be paid on the ninth day of July, and that the expenses of the commis-sioners remain unpaid.

The bill prays, that the treasurer may be decreed to pay over the said money to the committee appointed with himself to re-ceive and deposit it in the State Bank at New-Brunswick, or that the said treasurer may be decreed to deposit it there to the credit of the said commissioners, and to pay over to the secretary of the commissioners the sum of one hundred and fourteen dollars and thirteen and a half cents; that the election for directors may be set aside and decreed null and void; and further, that the presi-dent and directors be restrained, by the order and injunction of the court, from calling in the said instalment or receiving it, and from declaring the first instalment forfeited in case of non-pay-ment; and also from calling in any other instalment until the further order of the court.

The application for an injunction was made to the chancellor at his chambers; but considering it rather special in its character, and one not of ordinary occurrence, it was directed that a copy of the bill should be served on the defendants, and notice given of an application at some future day. This was done, and the matter came on to be heard on Tuesday the eighth day of July instant.

Upon the hearing, the defendants offered to read sundry affidavits, touching some of the matters stated in the bill, ta-ken exparte and without notice. Upon objection being made, the affidavits were ordered to be read, subject to the future opin-ion of the court. Before considering the case on its merits, it will be necessary to decide upon their admissibility. If this were

a new question, I should be strongly inclined to disallow them, upon the ground, that to permit affidavits to be taken as to particular matters charged in the bill, and taken exparte, might surprise the complainants, and either compel them to postpone their application for the purpose of procuring counter affidavits, or proceed to the hearing under great disadvantages. But I understand the question has been settled in this court, in favor of their admissibility. It is very certain that a practice has prevailed to a considerable extent, founded on the opinion that the law on the subject was settled ; and I shall accordingly admit them, and also the documents exhibited. If the bill had been on file the defendants might have put in an answer to it, and used that on the argument, not as an answer, but as an affidavit. This has frequently been done, and in almost every case in which the court has directed a notice to be given of the application, and a copy of the bill to be served; or where such notice has been given without express direction, on the ground that the court, if applied to, would have given such direction, it has been usual for both parties to produce affidavits. It was done in the cases of *Weston* v. *the Camden and Amboy Railroad and Transportation Co.*, and *Scudder* v. *the Trenton and Delaware Falls Co.*, *Saxton*, 696; and although no objections were made, they were received on the ground that it was in accordance with the practice of the court.

It is understood that such is the practice in the state of New-York, but I do not find any adjudged case in which the question was distinctly raised. In *Beekman* v. *the Saratoga and Schenectady Railroad Co.*, 3 *Paige*, 45—which was an application for an injunction—the defendants produced affidavits and documents against the motion, and they were read and adverted to by the chancellor in his opinion. From this it may be inferred, that the practice in that court is the same as in our own.

The English mode of granting injunctions differs so widely from ours, that we can only receive aid from their practice by analogy. That analogy is in favor of what I consider to have

been the practice in New-Jersey: *Morphett* v. *Jones*, 19 *Ves.* 350; *Eden on Injunctions*, 236, and the cases there cited.

David Mercereau testifies that he was one of the commissioners, and as their treasurer received from the subscribers thirteen thousand eight hundred dollars, all of which, except three hundred dollars, he deposited in the Mechanics and Traders' Bank in New-York. Ten thousand dollars were deposited on the seventh of April, and three thousand five hundred dollars on the fourteenth of April. For these deposites he received certificates as treasurer of the commissioners. He states further, that on Tuesday the sixth of May, he exhibited these certificates to the persons composing the committee appointed to receive from him the money, as above stated. They severally expressed themselves perfectly satisfied. That one of them, in reply to a question whether he should hand over the certificates to the commissioners, told him he must not do so, but keep them himself. That being compelled to leave New-Brunswick at eight o'clock in the morning of the sixth of May, he could not meet with the commissioners that day. That the election for directors took place on the eighth of May, and two thousand two hundred votes were given. On the evening of the same day the directors met and organized, and all of them save one were sworn into office. They elected James F. Randolph president. On the same day, deponent transferred and delivered to the president and directors of said bank the above mentioned certificates, and Lewis Carman's duebill for two hundred dollars, and one hundred dollars in money, making in all thirteen thousand eight hundred dollars, and received therefor a full discharge from the said president and directors of the said bank.

D. Fitz Randolph proves the publication of a notice for an election on the eighth of May, for at least three weeks, in both the papers in the city.

James F. Randolph testifies, that the amount of thirteen thousand eight hundred dollars, received from the subscribers, was received by the president and directors from D. Mercereau, one of the commissioners, in the certificates, note and money, as above stated; and that he, as president of the bank, caused the

said certificates to be taken to the Mechanics and Traders' Bank in New-York, and surrendered, and the said sum of thirteen thousand five hundred dollars to be deposited in the bank last mentioned to the credit of the Farmers and Mechanics' Bank of New-Brunswick, on the ninth day of May ; and that the same has ever since remained, and still does remain, in said bank ; and that he retains, as president, the said duebill and the said one hundred dollars—the whole subject to the order and direction of the said Farmers and Mechanics' Bank of New-Brunswick ; and that on the receipt of the said certificates, duebill and money, as aforesaid, from the said David Mercereau, he, by the direction of the board of directors of the bank, executed to the said David Mercereau a full and complete discharge therefor.

The affidavits of William Letson, Samuel Baker, and Lewis Carman, relate principally to the election, and the mode of conducting it, and will be adverted to hereafter, if need be.

The object of the present application is, that an injunction may issue to restrain the Farmers and Mechanics' Bank of New-Brunswick from calling in a second instalment on the capital stock subscribed. By the fourth section of the act of incorporation, five dollars on each share subscribed are directed to be paid to the commissioners at the time of subscribing, and the remainder in such instalments, and at such times, as the president and directors shall appoint. A call having been made for a second instalment, and the complainants alleging that it is made by persons having no right to make it—by a pretended corporation, having no legal existence—it becomes important to inquire, whether there has been in truth any lawful election of directors. This inquiry lies at the foundation of the whole case.

It appears by the bill itself, that the books for subscription were opened by the commissioners upon due notice, and that they remained open for the time prescribed by the act. More than two thousand shares were subscribed, and the sum of five dollars on each share actually paid by the subscribers to the commissioners at the time of subscribing. Upon this a meeting of the subscribers was called by the commissioners, and duly published, for

the eighth of May ; and on that day a majority of the stockholders met and went into an election ; and the persons now claiming to be directors, were elected by a large majority of votes.

But it is objected, that the election was without authority, and therefore void ; and this upon several grounds.

And in the first place, it is alleged that there was in truth no order of the commissioners to call a meeting of the subscribers for the eighth of May, the day the election was held.

I think this objection cannot prevail. The election, it is true, was to be had on the call of the commissioners ; but it was not essential that this call should be the result of any formal order of the commissioners. It is in evidence that the original notice given to the printer, is in the hand-writing of the secretary, he being one of the commissioners, and that with his own hand he signed the names of the other commissioners, including those who had not acted. It is not to be supposed that this was done without the knowledge and implied assent of the commissioners, or a majority of them ; much less, that it was done against their will. The notice was published for three weeks in the papers of the city in or near which they all reside, and the act was in no way disavowed. It is reasonable to presume that, although no direct order to that effect was given, it was understood to be a matter of course, and the secretary, himself one of the commissioners, felt himself authorized to give the notice. Under such circumstances, and especially as the notice was not recalled, or in any way disowned by the commissioners, I deem it right to consider it their act.

If, however, there were doubts on the subject, they would be removed by the proceedings of the commissioners on the sixth of May, at a meeting held on that day, and when the subject was brought before them, as it must have been from the nature of the resolution then adopted. They did not disown the notice, and declare it void as not being the act of the commissioners, but they resolved to postpone the matter until the twenty-second of May. This postponement is a recognition of the propriety of the original notice. If the one was invalid and unlawful, the other must have

been equally so, and thus an election held on the twenty-second would also, upon the principle contended for, have been unlawful. This was not, and could not have been, the intention of the commissioners. Their object doubtless was, to have the election lawfully held on the day fixed in the order of postponement.

But it is again objected, that the election was unlawful and without authority, because, upon the day on which it was held, to wit, on the eighth of May, the commissioners, or a majority of them, at a regular meeting, and by a formal vote, resolved to postpone the meeting of the subscribers to the twenty-second of May; and in defiance of such postponement, the subscribers, or a majority of them, proceeded to hold an election, and to organize themselves into a company under the act of incorporation. This raises the question as to the rights, powers and duties of the commissioners.

In all our acts incorporating banks, commissioners are appointed to open books and receive subscriptions for the capital stock. They are agents for those who shall afterwards subscribe to the stock; and they have, in a certain sense, a trust to execute on behalf of the public. They are to see that the money to be paid at the time of subscribing, is actually paid and received in good faith. This is an important duty. It is important to the public, that the basis of our monied institutions should be money itself, and not credit; and it is important to bona fide stockholders, that their property should not be placed under the control of speculators. They are to act as other bodies act. The will of the majority must govern, and the act of the majority must be taken as the act of the whole. They have a right to meet and organize for the transaction of business, as was done by the commissioners in this case, appoint their secretary, treasurer, and if need be, their committees. In some cases, though not in this, they have the distribution of stock where there is an excess. When the requisite number of shares of the capital stock are subscribed, and the first instalment paid, they are authorized and required to call a meeting of the subscribers, that they may organize and take their own business in their own

hands.    After such organization, the powers of the commissioners are at an end.

The call for the meeting of the subscribers on the eighth, we have already considered as proper.  Had the commissioners a right to postpone to the twenty-second?   I am unwilling to adopt the principle contended for at the bar, that after receiving the subscription, the office and functions of the commissioners cease entirely. They are the depositories of the subscription books, from which it is to be ascertained who are entitled to vote; and they hold the subscription money, which cannot properly be paid over until there is some lawful organization of the company.    It seems reasonable, then, that they should exist as a body until they can be lawfully discharged from the responsibility of their trust.    But I am equally unwilling to admit that the commissioners, after having advertised a meeting of the subscribers for the period specified in the act, can adjourn or postpone the same at their pleasure; for if so, they might entirely defeat the object of the act of incorporation.    It would be going too far, perhaps, to say, that they may not do it in any case.    Circumstances might occur, in which the exercise of such a power on the part of the commissioners would be indispensable.    But I consider that, as soon as lawful notice is given of a meeting of subscribers for the choice of officers, the subscribers acquire rights under it.    They acquire the right to hold the election at the time appointed, and to come into possession of the property they have invested; and as a general rule, the commissioners have after that no right to interfere against the will of the subscribers.    The act does not confer on them any such power, nor does it speak of any thing to be done by them after calling the meeting.    They are not required to attend at the election.    If they do attend, there is no power committed to them.    The election is not under their management or supervision.    Inspectors are to be chosen, not by the commissioners, but by the subscribers themselves; and those inspectors superintend and direct the election.    Neither the act under which they derive their authority, nor the reason of the thing, appears to contemplate such a power.

If the commissioners took upon themselves to exercise a power not specially granted, the rightful act of the subscribers in electing their officers ought not to be avoided, unless in the opinion of the court, a postponement was clearly necessary under the circumstances of the case. If no such necessity existed, the act of the commissioners, however well intended, was an excess of authority, and void.

Let us now inquire into some of the grounds assigned for the postponement, and see how far the measure was necessary for the protection of the interests of the commissioners, the subscribers, or the community.

The first and principal one is, that the treasurer of the commissioners had refused or neglected, when requested, to deposit the subscription money in the State Bank at New-Brunswick, pursuant to an order of the commissioners.

It is to be remembered, that the bill does not charge that the money was not actually paid by the subscribers, and received by the treasurer; on the contrary, these matters are distinctly alleged in the bill; and there is no charge that the money was not in the possession and under the contol of the treasurer. It is not charged that he lost, squandered or wasted it. But it appears, that on the twelfth day of April, after the subscriptions were received, a committee of three was appointed to take charge of the money, and with the treasurer deposit it in the State Bank at New-Brunswick. It was perfectly right for the commissioners to make such appointment, and take order in relation to the depositing of the money. The treasurer was their officer and agent. He received the money by their appointment, and for them, and as such treasurer, had no more right to detain it from their custody or control, than the committee appointed to receive subscriptions had to retain the books. The committee reported to the commissioners on the third of May, that they had called upon the treasurer, and were informed that he had deposited the money in a bank in the city of New-York. They then ordered that the treasurer should produce the money before the board on the sixth of May, or a certificate that the money was deposited to the credit

of the commissioners, or in default thereof that the election should be postponed. On the sixth of May, neither the money nor the certificate was produced; and the treasurer not appearing, they ordered the election of directors to be postponed to the twenty-second of the same month. The explanation given of the transaction by the treasurer is not very satisfactory, and must naturally have had a tendency to create suspicion in the minds of the commissioners; but it in some measure relieves the case as presented by the bill. Taken together, the amount is this: that one of the commissioners had the money in his own hands, as treasurer of the board; or rather, as such treasurer, had deposited it in a bank in the city of New-York; whereas the commissioners insisted that the money should be deposited in the State Bank at New-Brunswick. It is not alleged in the bill, that the money was not in truth deposited in the bank in New-York, or that it was unsafe there; but it was a contest between the commissioners and the treasurer, in regard to the custody of the money. I have already stated that the commissioners (I mean the majority of them) had a right to hold it as against their treasurer; and he erred in supposing he had a right to retain it. But I do not conceive that this was a sufficient ground for postponing the election, and thereby depriving the stockholders of the power of looking to their own concerns. Were they to be deprived of their franchise until this controversy was settled?—until it might be ascertained whether the treasurer, himself a commissioner, had a right to retain the money, notwithstanding the order of the commissioners that it should be paid to them or deposited to their order? I think not. It was not essential to their safety. Their claims upon the treasurer for the money were not impaired by the election. If the directors sought it at their hands, their right to compel the payment of it by the treasurer was a perfect right, and could be exercised as well after the election as before. Suppose the money in danger of being lost; would it have been right for the commissioners to take the matter under their own care, and by a temporary or indefinite postponement to preclude the stockholders from acting?

Nor was it essential to the interests of the subscribers or the public, that the election should be postponed. If it had been charged, or if there was ground to believe, that the treasurer had colluded with certain of the subscribers, to enable them to get control of the institution without the payment of money, and that the instalments had never been paid by them, it would have been important to the interests of the bona fide stockholders and the community, to inquire into the matter before the fraud was consummated. If the capital stock had not in fact been paid in, there should have been no election. But there is no such allegation; and the charges of combination and fraud that are made, as well as the circumstances adduced in support of them, are too general and indefinite for the court to act on, and of course could give to the commissioners no authority for the measure they adopted.

A third ground presented for the interference of the court is, that persons were allowed to vote at the election for directors, without having proper certificates, and that after the polls were closed, the inspectors opened them again to receive additional votes. In relation to these matters it is sufficient to say, that they are at most irregularities, and that the court cannot set aside an election for a mere irregularity.

Another ground taken at the bar is, that the expenses of the commissioners were not paid; but as the corporation is liable for them to the commissioners, I think it formed no ground to postpone the election; and I did not understand it to be relied on as sufficient in itself to authorize any action of the court.

So far, then, as the claims and rights of the commissioners, as such, are involved in this case, an injunction cannot be granted on the facts as now presented, upon the bill and affidavits.

Some of the complainants, however, are subscribers or stockholders; and they complain that the election was not in pursuance of law, and that those who voted combined together to get the management of the institution, contrary to their rights and interests.

[Hardenburgh et al. v. Farmers & Mechanics' Bank of N. Brunswick et al.]

If it appeared in point of fact, that any considerable number of subscribers had been deprived of their elective franchise, in consequence of the postponement; or that any fraud or concealment was practised; or that the officers elected had not been chosen by a majority of the whole number of votes; this branch of the case would have presented a serious difficulty. But it is not even alleged in the bill, that any one of the subscribers was prevented from voting by the postponement. There appears to have been no fraud or concealment practised; not a single illegal vote is alleged to have been taken. Out of two thousand seven hundred and sixty shares subscribed, two thousand two hundred were represented at the polls; and with few exceptions, the votes were all given to the persons elected. If the remaining subscribers voluntarily declined voting, under a misapprehension of their rights, it furnishes no sufficient ground to avoid the election, especially when it is evident their votes could not have varied the result.

Upon the whole case, it is the opinion of the court that the injunction prayed for ought not to issue. To authorize it, the court ought to be satisfied that the election was entirely without authority and void, and of course that there is no corporation in existence. Such is not the conviction of my mind from the circumstances presented to me by the bill and affidavits.

Having reached this conclusion, it is satisfactory to know that the claims of the complainants are not concluded by it. The injunction is only preliminary to the general relief sought. And if the suit be further prosecuted to obtain that relief, the court will always be ready to grant it when a proper case shall be presented. And on the other hand, it is equally satisfactory to learn from the affidavits read at the hearing, that the money which was in the hands of the treasurer of the commissioners, or the certificates of the deposite, have been paid or transferred to the bank; and that the amount is now on deposite, to the credit of the bank, and subject to its control.

The commissioners, who are the principal complainants in the case, as well in the course taken in regard to the election, as in

[Hardenburgh et al. v. Farmers & Mechanics' Bank at N.Brunswick et al.]

the filing of the present bill, have acted with commendable pru‑ dence, and a just regard to their own rights and responsibilities. If they erred in the construction of their powers, it is evident they were led into the error by a desire to secure themselves, and the interests of the stockholders, and the public ; and after what had taken place, it was proper for them to come to this court and ask its judgment. They were invested with an important trust, and they are entitled to protection, and to a proper discharge. They are not now entitled to have the money paid back, so that they may pay it over to the directors themselves ; but they are entitled to a certificate from the corporation, that the amount of the subscription money received by the commissioners has been received by the corporation, and that the commissioners as such are fully discharged.

The motion for an injunction is denied, but without costs.