Ranney, J.
The case presents a number of very interesting and important questions, relating to the appropriation of private property to the uses of railroad corporations. The proceeding was prosecuted under the provisions of the act of April 30, 1852 (Swan’s Rev. Stat. 232), in the probate court of Fairfield county. From such of the assignments of error as have been pressed upon our attention in argument, the following propositions are presented:
1. It is claimed, that the probate judge, being then treasurer of the company, but not interested in its stock, was incompetent to sit iupon the trial of the case.
2. That the probate court had no jurisdiction.
*3. That the court erred in compelling the plaintiff in error ■to go to trial jointly with another person, with whom he had no common interest, but whose separate property was sought to be appropriated.
*320 4. That tbe company had no legal or constitutional authority to appropriate lands for depot grounds.
5. That the court erred in holding that the increase of value to the property, arising from the construction of the road, should be excluded from the amount assessed to the owmer.
1. We do not find it necessary to express any opinion upon the first question presented. If the position was well taken, it was the duty of the probate court to have certified the cause to the court of common pleas. For reasons hereafter stated we must reverse this judgment; and the case will then go to the common pleas for final judgment, in pursuance of the provisions of section 10 of the act referred to. In no event can the probate judge be again called upon to act.
2. The second position relied upon is grounded upon the assumed unconstitutionality of the act under which the proceedings were had; and involves a denial of the capacity of the probate court to receive, jurisdiction in such cases by a general law. Section 8, of article 4, of the constitution, provides: “The probate court shall have jurisdiction in probate and testamentary matters, the appointment of administrators and guardians, the settlement of accounts of executors, administrators, and guardians, and such jurisdiction in habeas corpus, the issuing of marriage licenses, and for the sale of land by executors, administrators, and guardians, and such other jurisdiction in any county, or counties, as may be provided by law.”
This jurisdiction, it is evident, must depend upon a proper construction of the last clause of the section, which was added to the original draft by way of amendment, and is not very happily expressed. It is not doubted that the general assembly might confer this jurisdiction in one or more counties ; but it is *said it must be conferred by a special or local law, and can not be extended to all the counties of the state by a general enactment. The legislature has uniformly construed it differently. Not only the act now drawn in question, but the act investing that court with jurisdiction in minor offenses, are general laws extending to all the counties. This repeated expression of opinion on the part of the legislative body is not only entitled to great respect, but is absolutely binding upon us, until it is made unquestionably to appear that they have mistaken their powers, and a clear incompatibility between the constitution anú the law is established. 1 Ohio, 77. We are far from be~ *321 ing convinced that any such repugnancy exists. The words “in any county or counties,” were probably used rather as enabling-than restrictive language, and were designed to permit the general assembly — notwithstanding the provision of section 26 of article 2, requiring “ all laws of a general nature to have a uniform operation throughout the state” — in its discretion, to confer upon the-probate court more extended powers in some counties than in others. Upon the opposite construction, a power to confer the jurisdiction •in one county by a local enactment is a power to confer it in all the counties in the same manner; which brings us to the absurd conclusion that the legislature is competent to do by ninety laws what it is incompetent to do by one.
3. It appears from the record that the company commenced proceedings at the same time, and by two separate statements, against, the plaintiff in error, for the condemnation of twelve lots in his addition to the town of Lancaster, and against one Jacob Bowmaster for the appropriation of one lot belonging to him. The second bill of exceptions shows it to have been admitted that the two cases-were entirely separate, and that the parties held their property by distinct titles. Under these circumstances the court, at the instance-of counsel for the company, and against the objection of the plaintiff, ordered the jury to be impaneled *and the evidence to be given in both eases, at the same time, and jointly. In this, we think, the court most clearly erred. To a certain extent, the subject is not without difficulty; but there is none whatever, in saying the joint trial was wholly unauthorized. The second section of the law very properly allows the corporation to embrace in its statement, a description of all the property, lying in the county, which it desires to appropriate; and requires it to name the owner of each parcel, and the uses to which it intends to subject the.property. A jury is then to be selected, in the same manner and from the same persons, as the regular juries of the county, for which a venire issues, returnable on a specified day, and at the-same time a notice to each owner, “ of the time when such jury will meet at the office of said judge.” So far, all is plain. But-how shall the jury be impaneled ? In each case separately, or for all the cases embraced in the statement jointly? Upon this subject, the statute, like too much of our legislation, is full of doubt and obscurity. It expressly gives the right of challenge for cause to either party. The right of each owner to retain upon the panel *322 ¡such members of the regular jury, as neither the company nor himself could except to, would seem to be almost equally important ; but it is seriously impaired, if he is bound to submit to challenges made by other owners. I am, however, inclined to think that the law subjects him to this inconvenience, and contemplates but a single jury, to be composed of those against whom no just ■exception can be alleged, by any of the parties interested. But as no challenges were made in this case, it does not call for a definitive •opinion. Admitting the court to have proceeded irregularly, it does not appear that the plaintiff was injured. But there is a limit to this proceeding in common.
If the law, for the benefit of the corporation, compels each individual owner to submit to such inconveniences, as may be necessary to enable them to appropriate all the lands they may desire in the county, in a single proceeding, and with the view *of a single jury, it does not compel him to proceed jointly after the jury have returned from the view, nor to encounter the jargon, confusion, and uncertainty of a joint litigation. He has, then, the right to demand that his rights and interests shall engage the separate attention and examination of the jury, upon such evidence .as he may be able to produce — the 6th section expressly providing, “ that witnesses may be examined before said jury, after their return to the court aforesaid, and the trial in each case shall be ■conducted thereafter in said probate court, in the same manner that the trial of civil cases is conducted in the court of common pleas of the county in which said proceeding is had.”
In denying the plaintiff in error this right, the court most manifestly erred.
4. The lots sought to be appropriated, are described in the statement filed by the company, as a necessary part of its depot grounds in Lancaster. The plaintiff’s counsel deny that it has any power •to condemn -property for that purpose. One of them seems to insist that the general assembly could have conferred no such power, “ unless it was shown in the case made by the company, tlia-t the very existence of the corporation depended upon a resort to this extreme medicine of the constitution and both concur in •claiming that the act under which the proceedings were prosecuted, extends no further than to carry into effect section 5, •of article 13, of the constitution, which provides only for an -.appropriation of the right of and that, it is not alto *323 gether insufficient, but inconsistent, with the exercise of any authority under section 19 of the bill of rights. The argument amounts to this : By the latter section the property is to be paid for “ without deduction for benefits to any property of the owner which necessarily covers its true value in money, from whatever-.causes derived; but it may be assessed by any number of persons' a jury, and without the intervention of a court of justice. By the-first, it is to be assessed by a *jury of twelve men, in a court of record ; and is to be valued “ irrespective of any benefit from-any improvement proposed by such corporation.” In the one-case, allowing the owner the benefit of any increase arising from, the construction of the work ; and in the other, depriving him of it. And inasmuch as the act referred to, requires the jury to be-sworn to assess the amount irrespective of these benefits, it can not be extended beyond the purposes for which that mode of assessment is provided.
We do not concur in either position. This company was incorporated on the 4th of February, 1851 (49 Ohio L. L. 424), and was-invested with all the rights, and made subject to all the restrictions, of the general railroad act of February 11, 1848 (2 Curw. Rev. Stat. 1396). By section 9 of that act, the company is expressly authorized to appropriate such property as may be deemed necessary for-its railroad, including “necessaryside-tracks,demote,workshops,and water-stationswhile the first section of the act of 1852, provided that all appropriations thereafter made, either “for the right of way, or for any other purpose which might be within the legal authority of such corporation,” should be made and conducted under that act.
So far as the argument is based upon any supposed difference between these two sections of the constitution, as to the mode of assessment, or the amount to be paid, we think it, for reasons hereafter stated, wholly unfounded. It is, therefore, entirely immaterial which section is looked to for the governing principle. If either warrants the proceeding, there is no want of legislation to give it effect.
The question comes to this: Had the general assembly power to confer upon the corporation the right to condemn property for depot purposes ? The first thing to be borne in mind is, that neither of the sections referred to attempts to confer the power of eminent domain. They simply prescribe modes for, and limitations upon, its exercise. The itself is an incident of sov *324, 325 ereignty, and its exercise was delegated by'the ^sovereign ■power to the general assembly, in the general grant of legislative .authority. It may be defined to be the right of the sovereign, without the consent of the owner, when necessary, to make private property “ subservient to the public welfare.”
It rests upon the public necessity- — subordinates the rights of one to the welfare of all — and is just as broad as that necessity, and no broader. If the wants of the public are attained by the acqui-sition of an easement, nothing more can be taken; if the whole interest is required, the whole may be appropriated. Whether this power is derived from an implied condition in every grant, by which, property is held under the government; and whether, where no constitutional restraints exist, it may be exercised without making ■.compensation, are rather questions for ingenious speculation than of practical importance. It is enough that its existence is everywhere acknowledged, and that its exercise for many important purposes, both in peace and war, in the direct form of appropriation •and the indirect method of taxation, is absolutely necessary to enlabie any government to attain the great ends for which it is instituted ; while no enlightened government, at this day, attempts to •appropriate without compensation, and, in this country, it is everywhere enforced by constitutional provisions.
In this state, the power is lodged with the general assembly, to be used when necessary to the attainment of its -lawful purposes, •.and, in my judgment, can neither be surrendered, impaired, nor •abridged by that body.
One of these purposes, inferior to none in its influence upon the •comfort, convenience, and prosperity of the people, and the security of the state, is .the obligation to provide for the construction of public highways. I use the term in its largest sense, without any restriction as to the character of the structure, or the mode of travel •and transportation upon it. Such works can not be constructed without subjecting, to the use of the public, the lands of private individuals, situated in the particular localities necessary *to be occupied by these improvements. They must be had, either with or without the consent of the owner. As he has the power to withhold his assent, and as the necessary functions of government ought not to be paralyzed by the will of a single .individual, nor the interests of all be made subservient to the whim or of it *326 has always presented one of the most clear and unquestionable instances for tbe exercise of tbe power of eminent domain.
In tbe accomplishment of these purposes, when not expressly restricted by the constitution, the whole field of means and instrumentalities is left open to the choice of the general assembly. Such works may be constructed, in whole or in part, by the public, by means of taxation; or through the instrumentality and with the means of private individuals incorporated for the purpose; and, .under suitable regulations — according to the nature of the work— obligated to keep them open for general use, or made common carriers of passengers or goods. In either mode the great end is attained — a public highway, open to the use and necessary to the ■convenience, or business and social intercourse, of the public at large. If the latter is adopted, the private owner yields the use of' his property only to the public, and just so much, and no more, as will answer their purposes — the corporation being a mere trustee •of the interest for their use, with no power to divert it to any other purpose, or to hold it one moment longer than it is made to serve the uses for which it was appropriated. The Cincinnati, Wilmington and Zanesville Railroad Company v. Clinton County, 1 Ohio St. 77; Chagrin Falls and Cleveland Plank-road Company v. Cane, 2 Ib. 419.
The power of eminent domain is rather a political than judicial power, and by our constitution, its exercise is intrusted to the general assembly, so far as determining the necessity and propriety of the appropriation is concerned; while the courts are only invested with authority to -determine the amount of compensation to be paid. The power may be exercised directly by that *body, or through subordinate agencies; and while it would seem to me much more consistent with a proper regard for private rights, that the question of necessity as well as compensation should here, as in England, be determined by some impartial public tribunal, 1 am not prepared to say that any well-founded constitutional objection exists to committing its exercise to the corporation authorized to construct the work, as has been generally done in this state. In saying that the exercise of this power properly belongs to the general assembly, and not to the judiciary, I do not intend to express a doubt, that in cases where its limits have been exceeded, or its .spirit and purpose abused, a judicial remedy may not be afforded. If the legislature, by a direct exercise of authority, should under *327 take to appropriate property for purposes beyond the scope of this' power; or if any subordinate agency, under a power properly conferred, should abuse the authority by using it irregularly, oppressively, or in bad faith, there can be no doubt of the power of the courts to furnish an effectual remedy against such illegal acts.
I have said that a public necessity must exist to warrant the exercise of this power; but I am very far from agreeing that it must be that controlling necessity upon which the very existence of the corporation depends, spoken of by counsel. I think this doctrine, and that advanced by the chancellor in Beekman v. The Saratoga and Schenectady Railroad, 3 Paige, 45, that the power “ may be exercised, not only where the safety, but also where the interest, or even the expediency of the state is concerned,” about equally at fault. The ■ subject is not, at this day, altogether at large. The power has been exercised so long, and has been so often subjected to judicial scrutiny, as to leave little difficulty in assigning its proper limits. It will be found, upon examination, that the necessity upon which the proper exercise of the power depends, relates rather to the nature of the property and the uses to which it is applied, than to the exigencies of the particular case in which it is exercised. Nearly all personal ^property, in time of peace, is excluded from its operation, because the state can go into market upon an equal footing with other purchasers, and supply its wants in that manner. But where lands, connected with precise localities, are needed for a public highway, or any of its necessary appendages, a case of public necessity is established; and it is no objection to the exercise of the power, that other lands, equally feasible, can be obtained by purchase.
These views necessarily lead to the conclusion that upon any question, bearing in any manner upon this case, connected with the appropriation of private property, it can make no difference whether-the power is exercised directly by the state, for a work belonging to the state, or by a corporation as a public instrumentality, in the-name and under the authority of the state: provided the work for which it is taken is public in its nature and uses, and is open to iliense of the public, under reasonable regulations, as a matter of right and not merely of favor; and that it is enough to establish a public necessity, when it appears that lands are necessary for such a work, without going further and showing that it could not be constructed, without the use of the particular property sought to bo appropri *328 ated. And this brings us to the precise question stated: Does the appropriation of land to be used for depot purposes, as well as the track of a railroad, fall within the spirit and purpose of this power?' We see no reason to doubt it. The necessity for fixed property, situate in particular localities, is just as urgent and indispensable in the one case as in the other. Indeed, without the use of grounds-upon which to receive and discharge freight and passengers, the-track itself would be useless; and if the proceeding could only be referred to that provision of the constitution which specifically regulates the appropriation of a right of way, there could be very little doubt that such indispensable appendages to the use of the track would be covered by its terms. Nor does the argument that such an appropriation can not be made, derive any support *from the suggestion, that a fee is taken in the one case and a mere easement in the other, for the reason that when a fee is required, the-power extends to its appropriation; and for the still more conclusive-reason, that no such difference, in our opinion, exists. The use of the property is all the public interests require in either case, and consequently all that can be appropriated; but, being a perpetual and exclusive use, it may, and ordinarily does, cover the whole value of the property. The quantity of land that may be appropriated for this purpose is left, it is true, very indefinite. It is clear, however, that only so much can be taken as is necessary to be used in that manner. And with the power of the courts to prevent abuses, and the certainty that it can be held only so long as it is-thus used, and can not be diverted to any other purpose, there may be little danger of attempts to get too much.
5. The last question presented relates to the rule of compensation adopted by the probate court.
Upon various questions arising upon the introduction of evidence,, the court in effect held, that there should be excluded from the-present value of the plaintiff’s property so much as had been added to it by the construction of the railroad, and that he should have a, verdict only for so much as the property would have been worth if the road had not been proposed or built. These decisions seem to have been based upon.the idea, that the proceeding was to-be governed wholly by section 5 of the corporation article,, and upon the controlling effect of the word “irrespective,” used in that section. While it is admitted upon all hands that property taken for any public use, without the intervention of a corporation, *329, 330 must be paid for at its full value at the time it is taken, without any regard to the causes that may have contributed to make up that value, it seems to be argued or assumed by counsel upon both sides (but with different objects), that a different rule is established when a right of way is appropriated to the uses of a corporation, and that, in such case, any increase of the lvalue of the property arising from the contemplated construction of the road, should be excluded from the compensation awarded: the one case, it is said, being controlled by section 19 of the bill of rights, and the other by the section above referred to; thus, in the construction’ of the same description of improvements, making the constitution discriminate in favor of corporations, and against the public; so that, if the state should undertake to make a free turnpike, it might be obliged to pay moré, and the owners of property taken might be entitled to receive more, than though the same work was undertaken by a corporation, with the right to receive tolls for the use of the road when built. Upon this subject we have the misfortune to differ in toto, not only with the court below, but with counsel. We find nothing in the language, history, or purposes of either provision to warrant such a distinction; and we find it difficult to imagine a more palpable perversion of the spirit and object of section 5 of article 13 than such a distinction involves. To our understanding, these sections provide for no two rules of justice or obligation; but to every intent, and for every purpose, having the least relation to the present controversy, they are, in legal effect, identical.
Section 19 of. the bill of rights commences with providing for the inviolability of private property, but declaring its subserviency to the public welfare, upon making a compensation in money to the owner. The balance of the section is taken up with directing how, when, and in what manner this compensation shall be ascertained and paid. As to the mode of ascertaining the amount, it provides: “ Such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner.”
Section 5 of article 13 is confined exclusively to appropriations by corporations of the right of way; and provides that they shall not be made until full compensation therefor, to be ascertained by a jury of twelve men in a court of record, is “ first made in money, or first secured by a deposit of money, to *the owner, irrespective of .any benefit from any improvement proposed by such corporation.”
The identity of these provisions, as to the course of proceeding *331 required to ascertain the compensation to be awarded, has been settled by this court, in the case of Lamb and McKee v. Lane; in which it was held, that the jury referred to in the first of these sections, was the common-law jury of twelve men, and that such a jury belong to, and could exercise its functions only in, a court of record. The rule of compensation prescribed in this section for the .government of the jury, has been rightly apprehended in the argument ; but how a different rule is elicited from the language of the other section, is not easily perceived. By the one, the compensation is tobe assessed “ without deduction for benefits,” and by the other, “irrespective of benefits;” and by each, a full compensation is required. Now, when is a man fully compensated for his property? Most clearly and unquestionably, when he is paid its full value, and never before. The word “ irrespective ” relates to this full compensation, and binds the jury to assess the amount, without looking at or regarding, any benefits contemplated by the construction of the improvement. When this is done, and this consideration wholly excluded, the jury have nothing to do but ascertain the fair market value of the property taken; which is but saying that nothing shall be deducted from that value on account of such benefits. The opposite construction, so far from requiring the assessment to be made irrespective of these benefits, in effect compels the jury to ascertain their value to the property, and to deduct so much as they have increased it; thus using a word introduced for the sole benefit of the property-holder, in such manner as to deprive him of a portion of the acknowledged present value of his property, or to allow him to be paid for a part of its value in benefits; and, at the same time, fastens upon the constitution the gross inconsistency of allowing a corporation to procure the right of way upon easier terms than ■could be done by the public.
*But, it may be asked, why was this section retained, if it is identical with the section in the bill of rights ? It might be more difficult to show an absolute necessity for it than to give it a proper construction. It will be remembered by those who are curious to trace its history, that each article of the constitution came from a separate committee, and redundant provisions were therefore almost unavoidable. In this instance, however, the section as originally introduced served a distinct purpose, and differed from that in the bill of rights, in requiring the money, in all cases, to be paid ■before the property was taken. It was afterward made to conform *332 in. this particular by amendment, and then retained by a direct vote' upon a motion to strike it out. It was quite impossible to arrive at the motives of all those who voted to retain it; but it is certain that many considered it expedient to do so, for the purpose of foreclosing, by the implication it afforded, any question as to the power to appropriate property to the uses of a corporation authorized to construct a public improvement. We do not now say that it may not, in some possible particulars, differ from the section in the bill of rights; but upon the question now under consideration, the intention of the convention to make them alike is placed beyond all doubt, from the fact that it went to the committee of revision with, positive instructions “to make the rule of compensation therein provided, correspond with that established ” in the section of the bill of rights referred to. 2 Const. Debates, 850.
For these reasons, we are clear in the opinion that no such distinction as that attempted to be made, can be supported; and that the probate court wholly misconceived the true meaning of section-5 of article 13. -That whether property is appropriated directly by the public, or through the intervention of a corporation, the-owner is entitled to receive its fair market value at the time it is-taken — as much as he might fairly expect to be able to sell it to others for, if it was not taken — and that this amount is not to be increased from the necessity of.the public *or the corporation to have it, on the one hand; nor diminished from any necessity of the owner to dispose of it, on the other. It is to be valued precisely as it would be appraised for sale upon execution, or by an executor or guardian; and without any regard to the external causes that may have .contributed to make up its present value. The jury are not required to consider how much, nor permitted to make any use of the fact that it may have increased in value by the proposal or construction of the work for which it is taken. To allow this to be done would not only be unjust, but would effect a partial revival of the very abuse which it was a leading purpose of these constitutional provisions to correct.
It would be unjust, because it establishes for a corporation what is done for no one else — a sort of right in the property of others, to-the reflected benefits of its improvement; itself submitting to no reciprocity by affording others a compensation for the effect of their improvements, upon the property of the corporation. And it is doubly unjust where, as must very often happen, the increase in *333 •value accrued to the benefit of a former owner, and has been bought and paid for by the present holder, from whom the property is taken at a diminished price.
Upon the whole case, we are clear in the opinion that the probate court erred in the two particulars pointed out, and the court of common pleas in affirming its judgment. Both judgments are therefore reversed, and the cause remanded to the court of common pleas for further proceedings.