## Case No. 9,645.

### MINOT v. PHILADELPHIA. W. & B. R. CO.

[2 Abb. (N. S.) 323: 7 Phila. 555; 3 Am. Law T. Rep. U. S. Cts. 193; 27 Leg. Int. 396; 5 Am. Law Rev. 370; 2 Leg. Gaz. 385.] [1]

Circuit Court, D. Delaware. 1870. [2]

CORPORATIONS—TAXATION — CONSTITUTIONAL LAW —COMMERCE BETWEEN STATES.

1. A circuit court has jurisdiction of a suit by a citizen of another state against a corporation created by the state in which the court is held; notwithstanding the corporation also holds charters from other states.

[Cited in Howard v. American Dairy, etc., Co., Case No. 6,753.]

2. A state, acting through its legislature, may denude itself, by a contract, of power to impose taxes upon a corporation. But such exemption must be conferred expressly, or must appear by clear and necessary implication from the legislative act; it cannot be favored by presumption or intendment.

3. The payment by a corporation, to the government of the state, of a bonus for granting a charter of incorporation, does not protect the grantee of the franchise from all taxation, except such as the state has reserved a right to impose in the charter itself.

4. A tax upon the ordinary and lawful means of transportation is really a tax upon the thing carried; hence, a state law imposing a tax upon locomotives, passenger and freight cars, &c., being not merely a police regulation, but an expedient for raising revenue, involves a tax upon the passengers and freight transported, and is unconstitutional as interfering with commerce between the states.

[Cited in Morrill v. State, 38 Wis. 431.]

In equity.

STRONG, Circuit Justice. The complainant is a citizen of the state of Massachusetts, and a stockholder of the Philadelphia, Wilmington, and Baltimore Railroad Company, a body corporate of the state of Delaware, under the laws of that state. The defendants are the said company, and two other citizens of Delaware, one, the treasurer of the state, and the other, collector of state taxes. The facts of the case, out of which title to equitable relief is claimed to arise, are these:

By an act of assembly of the state of Dela-

1 [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission. 3 Am. Law T. Rep. U. S. Cts. 193. and 5 Am. Law Rev. 370, contain only partial reports.]
2 [Affirmed in 18 Wall. (85 U. S.) 206.]

ware, passed 1832 [Laws Del. p. 107], and a supplement thereto, a corporation named the Wilmington and Susquehanna Railroad Company was created, with power to build and maintain a railroad from the boundary line of Pennsylvania and Delaware to the city of Wilmington, and thence to the line of the state of Delaware towards the Susquehanna, in the direction of Baltimore. The act provided that the company should pay annually into the treasury of the state a tax of eight per cent. on all dividends which might exceed six per centum on the capital stock actually paid in. This provision was subsequently repealed; and it was enacted that the company should pay annually into the treasury of the state a tax of one-quarter of one per cent. on the capital stock of four hundred thousand dollars. Under an act of assembly of the state of Maryland, enacted in 1831 [Laws 1831–32, c. 296, § 19], and under its supplements, another railroad company was created, called "The Delaware and Maryland Railroad Company," with power to construct and maintain a railroad from some point on the Delaware and Maryland line, to some point on the Susquehanna river: and it was provided in the act, that the shares of the capital stock of the company "should be exempt from the imposition of any tax or burden by the states assenting to said act, except upon that portion of the permanent and fixed works of said company which might be within the state of Maryland." About the same time (namely, in the year 1831), under an enactment of the legislature of Maryland, another company was chartered, called "The Baltimore and Port Deposit Railroad Company," with power to construct and maintain a railroad from Baltimore to Port Deposit, which is on the Susquehanna river. And in the same year (1831), the legislature of Pennsylvania authorized the incorporation of a company called "The Philadelphia and Delaware County Railroad Company," with power to construct a railroad from Philadelphia along or near to the route of the Baltimore post road, to the Delaware state line. The name of this company was subsequently changed to that of "The Philadelphia, Wilmington, and Baltimore Railroad Company." All the companies were organized, and their roads formed a complete line between the cities of Philadelphia and Baltimore, needing only a bridge across the Susquehanna, which was subsequently built by the consolidated company, at a cost of about one million and a half dollars.

It was doubtless the intention of the several legislatures to provide for a continuous line between the two cities. Subsequently, under the authority of legislative acts of the states of Maryland and Delaware, passed in 1835, the Wilmington and Susquehanna Railroad Company and the Delaware and Maryland Railroad Company were consolidated under the corporate name of the former, and became one body politic or corporate, the capital stock of the two companies being united. The act

of assembly of the state of Delaware authorizing the consolidation, enacted that the holders of the stock of the united companies should hold, possess, and enjoy, all the property, rights, and privileges, and exercise all the powers granted and vested in the said railroad companies, or either of them, by it or any other law or laws of Delaware or Maryland. A similar act was passed by the legislature of Maryland. Thus the four companies became reduced in number to three. A further consolidation then took place. In the year 1838, the three companies, under legislative provisions of the three states named, were united and merged into each other, thus becoming one body corporate, with a common stock, and having as the corporate name, "The Philadelphia, Wilmington, and Baltimore Railroad Company." The act of the legislature of Delaware, under which this consolidation was effected, declared that "the respective companies shall constitute one company, and be entitled to all the rights, privileges, and immunities which each and all of them possess, have, and enjoy, under and by virtue of their respective charters." The words of the Maryland act were, "that the said body corporate so formed shall be entitled within this state, to all the powers, privileges, and advantages, now belonging to the two first above named corporations;" those whose road lay within Delaware and Maryland.

Such was the origin, and such are the rights of the corporation defendants, so far as they need now be stated. The company have completed, and now maintain a continuous railroad route from Philadelphia to Baltimore, through parts of the three states named. Its capital stock consists of one hundred and eighty-six thousand and eighty-eight shares, fully paid, each of the par value of fifty dollars, although at its formation it had only forty-five thousand shares. Of these less than two thousand were held by citizens or residents of Delaware, on June 30, 1869. The entire length of the railroad is ninety-nine and seventy-six-hundredths miles, of which only twenty-three and three-hundredths miles are in the state of Delaware, and the value of the property locally situated in that state, is much less than twenty-three-ninety-ninths of the whole. Much the larger portion of the locomotives, passenger and freight cars, and trucks, belonging to the company, were used during the year 1869 for the purpose of transporting persons and freight in and by a continuous course of transportation, through, from, and into the state of Delaware, and very few were used exclusively within the state.

By an act of assembly of the state of Delaware, passed April 8, 1869 [Rev. Code Del. 1874, p. 41], the legislature imposed upon every railroad and every canal company, incorporated by or under any law of the state, and doing business therein, in addition to other taxes then imposed by law, a tax of one-fourth of one per cent. of the actual cash value of every share of the capital stock of such company, directing the tax to be paid to the state treasurer on the first day of the next following July, and on the first day of July in each and every year thereafter. The president and treasurer of every such company was required to furnish to the state treasurer, every year, a statement of the number of shares of the company, with an appraisement thereof, verified by his oath or affirmation, on the first of each July, and forthwith to pay the amount of the tax. It was provided, however, in the act, that where the line of railroad or canal belonging to any company liable to the tax, lay partly in the state of Delaware and partly in an adjoining state or states, such company should be required to pay the tax on such number of the shares of its capital stock as should be in that proportion to the whole number of shares of such stock, which the length of such railroad or canal within the limits of the state should bear to the entire length of such railroad or canal. By section 5 of the act, it was enacted, that if the president or treasurer of any company liable to the tax, should neglect or refuse to furnish the statement above described for a period of ten days after it was required to be furnished, the state treasurer should notify an assessor to assess the tax, and issue a warrant to a collector of state taxes to collect the same.

Section 1 of the same act imposed another tax upon the same class of companies, with similar provisions for its ascertainment and collection. It was a tax of three per centum upon the net earnings or income received by such a railroad or canal company, from all sources during the preceding year, with a proviso like that contained in section 4 already mentioned. This tax was required to be returned and paid on the first day of January in each year, or within thirty days thereafter.

Section 3 of the same act imposed yet another tax, with similar provisions for its return and collection. It enacted that every railroad company incorporated by the state, and doing business therein, should, on the first day of January in each year thereafter, within thirty days from such time, pay to the state treasurer a tax of one hundred dollars, for the use, in the said state of Delaware, of each locomotive belonging in whole or in part to such company, and at any time during the preceding year used by said company within the state of Delaware, and twenty-five dollars for the use in the state of each passenger car, belonging in whole or in part to such company, and at any time during the preceding year used by said company within the state, and ten dollars for the use in the state of each freight car of every description, and each truck belonging to such company, and at any time within the preceding year used by said company within the state. Section 6 of the act enacted that in case of default in paying any of the said taxes, a pen-

alty of ten per cent. thereon should be added by the collector, and collected with the tax.

The complainant charges that all the taxes are illegal; that they are imposed in violation of the rights conferred upon the Philadelphia, Wilmington, and Baltimore Railroad Company by its charter, and that they are forbidden by the constitution of the United States. On November 25, 1869, he inquired of the company whether they intended to protect his interests as a stockholder by resisting the collection of the tax; and stated that, as it was illegal, protection against it should be provided for. In response to his inquiries, the board of directors resolved, that while they protested against the illegality of the tax, they declined to take the responsibility of interfering to prevent its collection, leaving the stockholders at liberty to assert their rights as they might think proper. The complainant then filed this bill, praying that it may be decreed the corporation is not bound to pay the said taxes, or any of them, and that the act of the Delaware legislature, so far as it imposes them, and provides for their assessment and collection, is unconstitutional and void. The bill also prays an injunction upon the company against furnishing the statements required by the act, or paying the taxes, and upon the other defendants against taking steps for their collection.

At the argument it was queried whether the case was within the jurisdiction of the court, and whether, if it was, the case presented was a proper one for equitable cognizance. Upon these points I have no doubt. The complainant is a citizen of Massachusetts, and the corporation defendants are a corporation that owe their life to the state of Delaware, citizens, therefore, of the state, within the meaning of the judiciary act. True, they are also a corporation of Pennsylvania and of Maryland, but they are not the less on that account a corporation of Delaware. They have been sued in the circuit court of the United States at least twice before, and the fact that they are a corporation of three states has not been considered an objection to federal jurisdiction. The other two defendants are citizens of Delaware. And that the court has equitable jurisdiction of such a case as the present is not open to denial. That it has, repeated decisions show, and such has been the determination of the supreme court. Dodge v. Woolsey, 18 How. [59 U. S.] 331. It was also submitted at the argument, with some hesitation, that the act of the Delaware legislature, passed April 8, 1869, was not intended to apply to this railroad company. As I have no doubt that it was, I pass this by, and come directly to the great question of the case: Is the act unconstitutional, so far as it imposes the taxes mentioned in it upon the corporation defendants?

The argument on behalf of the complainant is, that in the charter of the company there is an express exemption from liability to the imposition of any such taxes, and that the charter being a contract with the state, the act of assembly of 1869 is in conflict with the provisions of the constitution that inhibit the states from passing any law impairing the obligation of contracts. If it be the fact that the charter contains such an exemption, it must be admitted that the consequence mentioned follows, for it is too late to deny that the charter is a contract between the state and the company, and (however well it might be doubted, if it were an open question), it must be conceded that a state, acting through its legislature, may, by contract, in whole or in part, denude itself of power to impose taxes upon a corporation created by it. True, this is a step towards self-destruction, and one would think no state constitution gives such power to its legislatures. Yet it has more than once been decided; and many contracts made by states with corporations, that their property shall be exempt from taxation, in whole or in part, for limited periods or permanently, have been enforced. See cases collected in Home of the Friendless v. Rouse, 8 Wall. [75 U. S.] 430.

But I do not think the charter of this company contains any express exemption from liability to such taxation as the state of Delaware is now attempting to enforce. What is relied upon by the complainant in support of his assumption that the company is thus exempted, is section 19 of the Maryland act, incorporating the Delaware and Maryland Railroad Company. By that section, that company was declared to be exempt from the imposition of any tax or burden, by the states assenting to the law, except upon that portion of the permanent and fixed works of said company which may lie within the state of Maryland; and it was further declared, that any tax which should thereafter be levied upon said section, should not exceed the rate of any general tax which might at the same time be imposed upon similar real or personal property of the state, for state purposes. And when, by its act of July 24, 1835, the Delaware legislature consented to the consolidation of that corporation with its own company, "The Wilmington and Susquehanna Railroad Company," under the corporate name of the latter, it was enacted in the first section that the holders of the stock of the said railroad companies so united, as provided for, "shall hold, possess, and enjoy, all the property, rights, and privileges, and exercise all the powers granted to and vested in the said railroad companies, or either of them" by that act, or by any other law or laws of Delaware or Maryland. So a prior act passed in 1833, whereby the Wilmington and Susquehanna Railroad Company was authorized to form a union with such companies as then were or might thereafter be incorporated in the states of Pennsylvania and Maryland, for the purpose of constructing railroads in said states, so that the capital stock of said companies should constitute a common stock, enacted

that the respective companies should "constitute one company, and be entitled to all the rights, privileges, and immunities which each and all of them possess, have, and enjoy, under and by virtue of their respective charters." Hence it was argued, that because the Delaware and Maryland company was expressly exempted from any taxation, except upon its fixed and permanent property lying within the state of Maryland, the consolidated company, namely, this defendant corporation, is entitled to the same exemption in the state of Delaware.

To this I cannot assent. The argument, I think, misapprehends the statutes upon which it is built. True, the present company possesses all the rights and immunities which each of its constituents enjoyed before their consolidation. But what were those rights and immunities? Unquestionably they were only such as could be conferred by the states that created the corporation. The legislature of Maryland could not confer upon the corporations created by it any rights in Delaware; nor could it confer upon them any immunity from taxation upon their property within the state of Delaware—I mean any immunity from Delaware taxation; and it made no attempt to do so. Section 19 of the act of 1835 refers to exemption from Maryland taxation, and to no greater. That was the right, the privilege, the immunity, possessed by the Delaware and Maryland Railroad Company, and that right or immunity belongs now to the consolidated company. The language of the act authorizing a union of the companies is not that they shall, when united, have all the rights and immunities in this state, which each of them has in the state by which it was chartered. The purpose was not to extend any of the powers or privileges possessed by the several companies, but to give them, as they were, collectively to the united company. In other words, it was intended that the consolidated company might exercise, within Maryland, the rights of the Maryland corporations, and enjoy their privileges, and, within Pennsylvania, possess the rights and privileges of the former Pennsylvania company. Such I understand to have been the construction adopted by the supreme court in Philadelphia & W. R. Co. v. Maryland, 10 How. [51 U. S.] 376. The act of Maryland which authorized the two companies of that state to unite with the companies of the other states, enacted that the new corporation—that is, the consolidated one—should be entitled, within that state, to all the powers and privileges and advantages, then belonging to the two Maryland corporations. In commenting upon this, Chief Justice Taney remarks as follows: "Now as these companies held their corporate privileges under different charters, the evident meaning of this provision is, that whatever privileges and advantages either of them possessed, should in like manner be held and possessed by the new company, to the extent of the

road they had respectively occupied before the union; that it should stand in their place and possess the powers, rights, and privileges they had severally enjoyed in the portions of the road which had previously belonged to them." I hold, therefore, that there is in the charter of the present defendant corporation, no express exemption from liability to taxation by the state of Delaware.

And I can find nothing in any of the legislative acts relative to this company (viz: acts that gave it its existence), which, in my opinion, would justify me in holding it impliedly exempt from such taxation. Any implication, to have such an effect, must be a necessary one; every presumption is against it. The right to tax all property of natural and artificial persons within a state is an attribute of state sovereignty. Conceding now, as I must, in view of past decisions, that it may be partially surrendered, it must still be ruled that as the right is essential to the existence of the body politic, nothing less than that which is equivalent to an express surrender of it, by a binding contract, will avail to enable any person or corporation successfully to assert an exemption from liability to its exercise. Without attempting to cite even a tithe of the cases in which this principle has been asserted, I mention two: Providence Bank v. Billings, 4 Pet. [29 U. S.] 503; Railroad Co. v. Maryland, 10 How. [51 U. S.] 376.

What is relied upon by the complainants as raising an implication of exemption are the following provisions of the acts already mentioned. By the Delaware act of June 18, 1832, which incorporated the Wilmington and Susquehanna Railroad Company, the capital stock was defined to be four hundred thousand dollars, and the company was required to pay annually into the treasury of the state a tax of eight per cent. on all dividends which might exceed six per cent. on the capital stock actually paid in. By the supplement to this act, passed July 24, 1836, this provision respecting a tax on dividends was repealed, and it was enacted that the company should pay annually into the treasury of the state a tax of one-quarter of one per cent. on the capital stock thereof, of four hundred thousand dollars, the tax to be paid semi-annually. By a further supplement, passed June 27, 1836, the company was authorized to increase its capital stock to an extent not exceeding three hundred thousand dollars, with a proviso that the right of taxing the said sum when it should become a part of the capital stock should be reserved to the legislature. As all the privileges and immunities of this company have devolved upon the now existing company, it is argued that the stipulation that the Wilmington and Susquehanna Company should pay a tax of one-quarter of one per cent. on its capital of four hundred thousand dollars amounts to a contract that it shall not be liable to further taxation; and that, consequently, the present defendant corporation is protected to that extent.

. To this I cannot accede. The act of 1835 does not declare that no other taxation shall be imposed, or that the power of the state is exhausted; nor is such the necessary implication from what was said. Certainly it is not to be inferred from the imposition of a tax that no additional tax shall be laid; and I cannot perceive that it makes any difference whether the tax is imposed by general law, or reserved in a contract obtained from the state. All persons dealing with the state are presumed to know the character of the party with whom they are dealing; and, if they are obtaining a grant of a franchise, that the grant is always construed strictly against the grantee. In Com. v. Easton Bank, 10 Pa. St. 442, it was decided, that a bank which had been chartered under a general law that prescribed the payment of a specified tax on its dividends, was subject to a later general law increasing the rate of taxation, and that the later law, as applied to the bank was constitutional.

I agree that the reservation in the act of 1836, of a right to tax the additional stock authorized, tends to awaken suspicion that the legislature had some doubts whether, without the reservation, any tax could be imposed additional to that spoken of in the act of 1835. But this is not enough to overcome the presumption that there was no intention in either act to destroy the right of the state to prescribe such taxation as its necessities might require.

It has been argued that when a charter has been granted to a company, and a bonus has been exacted for it, the franchises and property of the company cannot be taxed any further than is provided in the charter, because, if I understand the argument correctly, the company is a purchaser of its rights in such a case. If this were so, the argument does not apply to the case in hand; for no bonus was exacted from this company. It cannot be said that the tax laid of one-quarter of one per cent. was in any proper sense a stipulation for a bonus. But I do not agree that a company which has paid a bonus for its charter, is thereby freed from liability to taxation. There is no reason that will bear examination for any such doctrine. If there is a bonus paid, it is only a part of the price paid for the franchise granted. It is measurably the consideration for the state's contract. But every charter to an improvement company is based upon a consideration given, or to be given, by the grantee. If it were not so it would not be a contract. It may not be a pecuniary consideration paid into the state treasury. It may be money expended for a public use, the construction of a highway, or something in which the public has an interest. What matters it then, that the payment of a bonus makes the grantee of a franchise a purchaser, when all grantees of corporate franchises are purchasers? There is a consideration given in all cases. The quantum of the considera-

tion is quite immaterial. The grantee of land from a state is commonly a purchaser for a consideration paid. He holds his title by contract. No one ever doubted that he takes the land subject to taxation. Why should it be otherwise with the grantee of a franchise? Land is no more property than a franchise. This has often been decided. Both are subject to the right of eminent domain. Bridge Co. v. Dix, 6 How. [47 U. S.] 507; 17 Conn. 454; 3 Paige, 45. Both in grants of land and in grants of franchises, the subjects of the grant are understood to be held under the government, not against it, and, of course, they are subordinate to the powers of the government, except so far as those powers have been unmistakably relinquished.

And I do not find that the authorities sustain the doctrine that the payment of a bonus for a charter protects the grantee of a franchise from all taxation, except such as the state has reserved in the charter itself a right to impose. Ohio Bank Cases, 16 How. [57 U. S.] 369, and 18 How. [59 U. S.] 331, certainly decide no such thing. In those cases it appeared there had been an express exemption, and what would have been the effect of a bonus paid was not considered. What was decided in Jefferson Branch Bank v. Skelly, 1 Black [66 U. S.] 436, was, that the charter of a bank is a franchise not taxable as such, if a price has been paid for it, which the legislature has accepted, with the declaration that it is to be in lieu of all other taxation. On the other hand, in Bank of Pennsylvania v. Com., 19 Pa. St. 144, where it appeared that by the charter of a bank it had been required to pay a very large bonus, it was, nevertheless, subject to an increased tax subsequently imposed. It was ruled that the bank acquired no privilege, exemption, or immunity, under its charter, except what was given expressly and unequivocally; that corporate privileges are never implied; that the legislature can only disarm the state of any portion of the sovereign power which belongs to her, by words showing that to be her intention so plainly that they cannot be misunderstood; that the taxing power is an incident of the state's sovereignty, and that the state does not lose it by granting a charter which says nothing on the subject. This was said of a charter that exacted a bonus of hundreds of thousands of dollars.

The case of Gordon v. Appeal Tax Court, 3 How. [44 U. S.] 133, has been called to my attention. It must be admitted that Mr. Justice Wayne, who delivered the opinion of the court, seems to have thought the acceptance of a proffered bank charter, which requires the payment of a bonus, constitutes a contract that binds the state not to impose any further tax upon the franchise granted, though not interfering with the right to tax the capital stock of the company. In answer to the question, "Why, when bought,

the franchise, as it becomes property, may not be taxed as land is, which has been bought from the state?" he said, "The reason is that every one buys land subject in his own apprehension to the great law of necessity that we must contribute from it and all of our property, something to maintain the state; but as to a franchise for banking, when bought, the price is paid for the use of the privilege while it lasts, and any tax upon it would be substantially an addition to the price." I confess that I do not feel the force of this attempted distinction. I do not see why, if a tax is an addition to the price in one case, it is not in the other. The truth is, it is in neither; for the purchaser in neither case has bought anything more than a right to enjoy the subject of the grant subordinately to the constitutional claims of the government. That is all that is meant by property held in civil society. But the remarks of Mr. Justice Wayne upon the subject were obiter dicta. The thing decided in the cause was that the state of Maryland could not impose a tax, not upon the bank either for its franchise or its capital, but upon its stockholders for the shares held by them individually, the charter of the bank having been granted in consideration of a bonus paid, and containing an express stipulation that the faith of the state was pledged not to impose upon the bank any further tax or burden during the continuance of its charter under the act.

My attention has been directed to no case which maintains the doctrine for which the complainants contend. It is sustained neither by reason nor authority. If, therefore, it be true (which I do not concede) that the clause in the Delaware act of assembly, passed July 24, 1835, which imposed on the Wilmington and Susquehanna Railroad Company a tax of one-quarter of one per cent. on its capital stock, was the exaction of a bonus, it does not, in my opinion, deprive the state of the power to levy upon the corporation defendant in this case additional taxes.

I come, then, to the conclusion that there is nothing in the act of assembly of April 8, 1869, so far as it imposes upon the company an additional tax of one-fourth of one per cent. on the cash value of its capital stock, and a tax of three per cent. on its net earnings, that is in conflict with the constitutional inhibition that no state shall pass a law impairing the obligation of contracts. With the fairness of such taxation I have nothing to do. The question before me is exclusively one of legislative power, and I think the legislature has not thus far transcended its legitimate authority.

The remaining question is attended with more difficulty. I refer to the legality of the tax imposed by section 3 of the act. That section exacts from the company the payment every year of a tax of one hundred dollars for the use in the state of each locomotive, owned in whole or in part by the company, and at any time during the preceding year used by the company, within the state. A similar tax, though less in amount, is imposed for the use in the state of each passenger, freight, and truck car; for the use of the rolling stock generally. This is not a tax upon the property of the company, nor upon its franchise generally. It is not a tax upon the locomotives or the cars. It is called a tax upon their use in the state; but it seems to be rather a license fee exacted for the privilege of using rolling stock. Can such a burden be imposed? I have said the franchise can be taxed as property, and that the property acquired or held under it is taxable; but it may be doubted whether such an exaction as this can be regarded as a tax either on the franchise or on the property of the company. Can the state, after having granted to the complainants the right to run locomotives in and through its territory freely, and also the right to use all the ordinary means of conveying freight and passengers, compel the payment of license fees for the use of those ordinary means of transportation, and that not for police purposes? Can it say to the grantees of this franchise, "True, you have purchased the right to use locomotives and cars; but if you use them you shall pay an additional price"? And is not a license fee thus exacted an additional price? I do not propose, however, to answer these questions or to decide that such an exaction is or is not an impairing of the obligation of the contract between the company and the state, for, in my opinion, the law of the state that attempts to impose this tax or duty is invalid for other reasons.

In the statement of facts to which the parties have agreed, I find the following. It is agreed "that much the larger portion of the locomotive engines, passenger cars, freight cars, and trucks, belonging to the Philadelphia, Wilmington, and Baltimore Railroad Company, were used during the year 1869 (the year for which this tax is attempted to be collected), on the aforesaid main line of railroad of the said company, extending from the city of Philadelphia, in the state of Pennsylvania, through the state of Delaware to the city of Baltimore, in the state of Maryland, and for the purpose of transporting persons and property in and by a continuous course of transportation through, from, and into the said state of Delaware; that a number of engines, passenger and freight cars, and trucks, were used during the said year, on the main line from Philadelphia to a point about a mile beyond Wilmington, and thence on the line of railroad known as the 'Peninsular Line,' extending through Delaware and a part of the eastern shore of Maryland to Christfield, and the several branches therefrom, and that very few of either the engines, cars, or trucks, of the said company, were used exclusively within the state of Delaware during the year 1869."

It is, therefore, admitted, that the tax or license fee is laid upon the use of the locomotives, cars, &c., mainly employed in transporting persons or property through the state from other states, or into it, or out of it. Such an imposition is, in my opinion, a regulation of commerce between states. It is a prescription that passengers and merchandise shall not be carried through the state except upon certain conditions. If the tax can be imposed at all, it may be to any extent. It has often been said that when a right to tax exists it is unlimited by anything but the discretion of the legislature that imposes it. This, of course, is to be understood as applying only to cases where the state has not by contract restricted its power. Said Chief Justice Marshall, in McCullough v. Maryland, 4 Wheat. [17 U. S.] 316: "An unlimited power to tax involves necessarily a power to destroy, because there is a limit beyond which no institution and no property can bear taxation. A question of constitutional power can hardly be made to depend on a question of more or less. If the states may tax, they have no limit but their discretion, and the bank must, therefore, depend on the discretion of the state for its existence." If this is so, the power to tax the use of all means or instruments of conveyance of persons or property through the state is the same as a power to prevent such use entirely. There is only a difference in the extent of its exercise.

Now, I think it can hardly be maintained that a law, declaring that merchandise and passengers shall not be carried on a public highway by locomotives or cars, from Philadelphia through the state of Delaware into Maryland, would not be a manifest regulation of inter-state commerce, quite as truly such as was the embargo of 1807 a regulation of foreign commerce. And if the enactment of such a law would be beyond the constitutional power of a state, the act of the Delaware legislature, of which the plaintiffs complain, must be equally so, for it differs only in degree. And it is not the less a commercial regulation, because it does not discriminate between transportation exclusively domestic and that which extends into other states. If a state chooses to exact conditions for allowing the passage or carriage of persons or freight through it into another state, the nature of the exaction cannot be changed by adding to it similar conditions for allowing transportation wholly within the state. I need hardly say, that a tax upon the ordinary and lawful means of transportation is practically a tax upon the thing transported.

Holding, then, as I do, that the Delaware statute of April 8, 1869, was an attempted regulation of commerce among the states, I come next to the question whether it was beyond the power of the state to make. I shall not enter at large upon a discussion of the much debated question, how far the power given to congress by the constitution to regulate commerce among the states is exclusive. Certain it is, that in the earlier decisions of the supreme court it was said to be unlimited, and so exclusively vested in congress that no part of it can be exercised by a state, except the power to regulate commerce completely internal; that is, entirely within a single state. Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1; and the Passenger Cases, 7 How. [48 U. S.] 283.

I am aware that it has often been argued, and sometimes intimated in decisions, that so far as congress has not legislated on the subject, the states may regulate commerce, at least internal commerce. Of this I remark in passing, that if they can, it is difficult to see why they may not add regulations to foreign commerce beyond those made by congress, for the power over both is vested in the federal legislature by the same words. But I apprehend it will be found on examination that the cases that have sustained state laws alleged to have been regulations of inter-state commerce have been those that related to bridges or dams across streams wholly within a state, or other kindred subjects—things only in a restricted sense commercial subjects. Wilson v. Blackbird Creek Co., 2 Pet. [27 U. S.] 250; Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713. They are exceptional. The subjects are such as in the last mentioned case it is said "can be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operation to such localities respectively." But, without pursuing this subject further, it may safely be said that none of them are like the present. They admit, and some of them assert, that wherever subjects of the power to regulate commerce are in their nature national, or admit of one uniform system or plan of regulation, they may justly be said to be of such a nature as to require exclusive legislation by congress. Surely passage and transportation through a state are of this nature. If not, it is unfortunate. It is of national importance that in regard to such subjects there should be but one regulating power, for if one state can directly tax persons and property passing through it, or indirectly, by taxing the use of means of transportation, every other may; thus commercial intercourse between states remote from each other may be destroyed. The produce of Western states may be effectually excluded from Eastern markets; for though it might bear the imposition of a tax by one state, it would be crushed under the weight of many.

I have already protracted this opinion to such a length that I do not feel justified in referring to many of the decided cases. In Almy v. California, 24 How. [65 U. S.] 169, it was ruled by the supreme court that a

law of the state imposing a stamp duty upon bills of lading for gold or silver transported from that state to any port or place out of the state, was substantially a tax upon the transportation itself, and was unconstitutional. It is true the decision was rested on the ground that it was a tax upon exports; and, subsequently, in Woodruff v. Parham, 8 Wall. [75 U. S.] 123, the court denied the correctness of the reasons given for the decision; but they said at the same time the case was well decided for another reason, viz: that such a tax was a regulation of commerce—a tax imposed upon the transportation of goods from one state to another, over the high seas, in conflict with that freedom of transit of goods and persons between one state and another, which is within the rule laid down in Crandall v. Nevada, 6 Wall. [73 U. S.] 35, and with the authority of congress to regulate commerce among the states. In the very recent case of Crandall v. Nevada, 6 Wall. [73 U. S.] 35, it was held that a special tax imposed by the state on railroad and stage companies for every passenger carried out of the state by them, was a tax on the passenger for the privilege of passing through the state by ordinary modes of travel, and not simply a tax on the business of the companies. Hence it was ruled that the power of a state to impose such a tax is inconsistent with rights conferred by the constitution on the federal government and on the people, and consequently that no state can lay such a tax. The majority of the court, indeed, declined to put their decision upon the ground that the tax was a regulation of inter-state commerce, and as such, beyond the reach of the state, but all the judges agreed that the state law was unconstitutional and void. The chief justice and Mr. Justice Clifford thought the judgment should have been placed exclusively on the ground that the act of the state legislature was inconsistent with the power conferred upon congress to regulate commerce among the several states, and I do not understand that the other members of the court held decisively that it was not thus inconsistent. The case, in any view of it, decides that a state cannot directly or indirectly tax persons for passing through or out of it. That is enough for the case I have before me. The Delaware statute of April, 1869, does indirectly levy a tax upon both persons and property for transit through the state, into it, and out of it. It is, therefore, in my opinion, so far in conflict with the constitution of the United States.

I shall, therefore, enjoin against any steps for the assessment, collection, or payment of the tax prescribed by section 21 of the act of April 8, 1869, namely, the tax for the use of locomotives, passenger cars, freight cars, and trucks, and I shall refuse the injunction prayed for to prevent the collection and payment of the tax prescribed by section 15, upon the actual cash value of every share of the capital stock of the company defendant, and I shall also refuse an injunction against the collection and payment of the tax prescribed by section 20 upon the net earnings or increase of the company.

Decree accordingly.

[The decree in this case was affirmed in the supreme court upon appeal. 18 Wall. (85 U. S.) 206.]